UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

UNITED STATES OF AMERICA  :
                          :
    - against -           :    OPINION AND ORDER
                          :
VIKTOR-KOZENY, FREDERIC    :    05 Cr. 518 (SAS)
BOURKE, JR. and DAVID      :
PINKERTON,                 :
                          :
        Defendants.        :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/21/07

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I. INTRODUCTION

Viktor Kozeny, Frederic A. Bourke, Jr., and David B. Pinkerton are

charged with participating in a scheme to bribe senior government officials in the

Republic of Azerbaijan ("Azerbaijan") in order to ensure the privatization of the

State Oil Company of the Azerbaijan Republic ("SOCAR") and to ensure that each

of the defendants and others would be able to participate in and profit from the

privatization. The grand jury returned the Indictment containing these charges on

May 12, 2005, but it remained sealed under October 6, 2005. On October 20,

2006, Pinkerton and Bourke ("defendants") moved separately pursuant to Federal

Rule of Criminal Procedure 12 to dismiss various counts of the Indictment as time-

-1-

barred and for failure to adequately charge federal offenses.[1]

These motions raise various issues of law that are of first impression
in the Second Circuit. Not only is there a dearth of Second Circuit law on these
issues, but there has been surprisingly few decisions throughout the country on the
FCPA over the course of the last thirty years — especially with respect to the
specific questions raised by these motions. Indeed, other than a single circuit
court decision and a district court case citing thereto — neither of which analyzed
the relevant subsection of the statute and neither of which binds this Court — no
case has addressed the statute of limitations challenge raised herein. As a result,
the Court was faced with the difficult task of addressing several first-impression
issues of statutory interpretation. After careful consideration, for the reasons
discussed below, both motions to dismiss are granted on the ground that the
Indictment is time-barred as to all counts except the false statement counts that
defendants do not challenge. In the interest of completeness, I also address
defendants' remaining contentions in support of their motions and find them all to
be without merit.

---

[1]     Pinkerton and Bourke also moved for a bill of particulars. That
aspect of the motion has been resolved.

## II. BACKGROUND

### A. Factual Allegations[2]

In the 1990's, Azerbaijan undertook to privatize certain of its state-owned enterprises. The privatization process was governed principally by the State Privatization Program from 1995 to 1998. Certain industries, however, such as the oil industry, could be privatized only at the direction of the president of Azerbaijan. SOCAR, which held Azerbaijan's oil and gas reserves and facilities, was one of the state-owned companies that could be privatized only by a special decree from the president. Pursuant to the privatization program, each Azeri citizen received, at no cost, a booklet containing four voucher coupons, which were freely tradeable bearer coupons that could be used to bid for shares of privatized companies at auction. Foreigners who wished to participate in the privatization or use vouchers at auction were required to purchase an option for each voucher coupon, which were sold at an official government price by the Azerbaijan State Property Committee (the "SPC"), which principally administered the privatization process.

---

²  Unless otherwise noted, the facts summarized in this section are taken from the Indictment.

## 1. Kozeny and the Investment Consortium

Viktor Kozeny is a Czech national, Irish citizen and resident of the Bahamas. In or about July 1997, Kozeny created Oily Rock Group Ltd. ("Oily Rock") and Minaret Group Ltd. ("Minaret"), both of which are organized under the laws of the British Virgin Islands with their principal place of business in Baku, Azerbaijain. Kozeny was President and Chairman of the Board of both Oily Rock and Minaret. Kozeny exercised effective control over both companies. For the benefit of its shareholders, which consisted of individuals and entities, Oily Rock entered into co-investment agreements with institutional investors to pursue a joint investment strategy in acquiring, safeguarding, and exercising at auction Azeri privatization vouchers and options for the primary objective of acquiring a controlling interest in SOCAR. Minaret engaged in various investment banking activities, including the acquisition and safeguarding of Azeri privatization vouchers and options on behalf of the parties to the co-investment agreements, which included Minaret itself (collectively, the "investment consortium").

Two members of the investment consortium were Omega Advisors, Inc. ("Omega") and Pharos Capital Management, L.P. ("Pharos"). Omega was a hedge fund organized as a corporation under Delaware law with its principal place of business in New York, New York. Pharos was an investment fund organized as

-4-

a limited partnership under Delaware law with its principal place of business in New York, New York until September 1998, then in Red Bank, New Jersey. Omega and Pharos, through their respective subsidiaries and affiliates, each entered into a co-investment agreement with Oily Rock and Minaret on or about April 30, 1998.

## 2. The Alleged Bribery Scheme

Beginning in August 1997, and continuing until 1999, defendants made a series of corrupt promises, payments, and offers of payments to Azeri government officials, comprised of a senior official of the Azeri government, a senior official of SOCAR, and two senior officials of the SPC (collectively, the "Azeri Officials"). The purposes of these payments included: (1) "to induce Azeri Officials to allow the investment consortium's continued participation in privatization;" (2) "to ensure the privatization of SOCAR and other valuable Azeri State assets;" and (3) "to permit the investment consortium to acquire a controlling interest in SOCAR and other valuable Azeri State assets."[3] The bribes were made in the form of cash, shares of profits from SOCAR's privatization, vouchers and options, wire transfers, stock, personal items, medical expenses and other things of value.

---

[3]      Indictment ¶ 19.

-5-

### 3. Bourke

Frederic A. Bourke, Jr. is a United States citizen. Bourke invested in Azeri privatization with Kozeny. Bourke was the principal shareholder of an investment vehicle named Blueport International, Ltd. ("Blueport"). In or about March and July 1998, Blueport invested a total of eight million dollars in Oily Rock, of which 5.3 million dollars were Bourke's personal funds. Bourke made these investments based in part on his understanding that Kozeny had paid and would pay bribes to Azeri officials to ensure SOCAR's privatization and the investment consortium's participation in the privatization.

Bourke assisted Kozeny in arranging for medical treatment for two different Azeri Officials in New York on three separate occasions. The treatments were paid for by Oily Rock and Minaret.

### 4. Pinkerton

Pinkerton is a United States citizen. In 1998, Pinkerton was the head of American International Group, Inc.'s Global Investment Corporation ("AIG"), a unit that managed billions of dollars of American International Group Inc.'s funds. In late March 1998, Clayton Lewis, an investment manager at Omega, contacted Pinkerton to solicit AIG's participation in a deal involving privatization in Azerbaijan, which had been brought to Omega by Kozeny a few weeks earlier.

AIG invested approximately $15 million in June 1998 pursuant to a co-investment agreement with Oily Rock and Minaret pursuant to which the parties agreed to pursue a joint strategy to acquire and exercise vouchers and options to gain a controlling interest in SOCAR. AIG wired the funds from accounts in New York to accounts controlled by Kozeny in Switzerland. Pinkerton caused AIG to make this investment based in part on his understanding that Kozeny had paid and would pay bribes to the Azeri Officials to ensure the privatization of SOCAR and the investment consortium's participation in the privatization.

## B. Official Requests for Evidence to Foreign Governments

On October 29, 2002, the Department of Justice's Office of International Affairs (the "OIA") submitted an official request to the Netherlands seeking, *inter alia*, bank account records from certain Dutch banks that "received wire transfers for the benefit of third parties and on behalf of an Azeri government official."[4] On January 13, 2003, OIA submitted a separate official request to Switzerland seeking, *inter alia*, records of bank accounts held by Oily Rock, Minaret and certain Azeri officials, and requested that a search be conducted of a law firm in Switzerland that represented Kozeny in the Azeri investment.

On July 21, 2003, the government applied for an order suspending the

---

4       Affidavit of FBI Special Agent George P. Choudras ¶ 22(a).

running of the statute of limitations based on these two official requests. On July 22, 2003, Judge George Daniels of the Southern District of New York granted the application, finding that "[i]t reasonably appears, and reasonably appeared at the time the official requests were made, that . . . evidence is, or was" in the Netherlands and Switzerland (the "July 22, 2003 Order").[5] Judge Daniels further found that at the time of the July 22, 2003 Order, no final action had been taken by either the Netherlands or Switzerland on those official requests.[6] The July 22, 2003 Order specified that the period of suspension of the statute of limitations "shall begin on the dates on which the official requests were made" and end upon the earlier of final action by both the Netherlands and Switzerland, or three years.[7] The Netherlands produced responsive documents on November 8, 2005. Switzerland produced documents on several occasions in partial execution of the request, the last of which was on September 10, 2004.[8]

---

[5]   July 22, 2003 Order, Declaration of Barry H. Berke, counsel for Pinkerton ("Berke Decl.") Ex. F.

[6]   *See id.*

[7]   *Id.*

[8]   There is a dispute over whether the last transmittal letter sent on September 10, 2004 constitutes a "final action" by the Swiss government. For the reasons discussed below, however, the date of final action by the Swiss government is irrelevant.

-8-

## C. Procedural History

The grand jury returned the Indictment on May 12, 2005, but it
remained sealed under October 6, 2005. On October 20, 2006, Pinkerton moved
pursuant to Federal Rule of Criminal Procedure 12 to dismiss Counts One, Five,
Eighteen, Nineteen, Twenty-One and Twenty-Four of the Indictment as time-
barred and for failure to adequately charge federal offenses. At the same time,
Bourke moved pursuant to Rule 12 to dismiss Counts One, Four, Five, Ten,
Eleven, Twelve, Fifteen, Twenty, Twenty-One, Twenty-Two and Twenty-Five of
the Indictment on the same two grounds.

## III. LEGAL STANDARD

### A. Motion to Dismiss an Indictment

Indictments are governed by Federal Rule of Criminal Procedure 7(c),
which requires that an indictment contain a "plain, concise and definite written
statement of the essential facts constituting the offense charged."[9] "It is well
settled that 'an indictment is sufficient if it, first, contains the elements of the
offense charged and fairly informs a defendant of the charge against which he
must defend, and, second, enables him to plead an acquittal or conviction in bar of

---

9       Fed. R. Crim. P. 7(c).

future prosecutions for the same offense."[10] An indictment must charge a crime "with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events."[11] "Nevertheless, an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."[12] A defendant may not challenge an indictment on the ground that it is not supported by adequate or competent evidence.[13] In evaluating a motion to dismiss an indictment under Rule 12, the Court must treat the allegations in the indictment as true.[14]

## B. Statutory Interpretation

When interpreting a statute, the well-established rules of statutory construction instruct that "the inquiry begins with the plain language of the statute

---

[10]     *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (quoting *Hamling v. United States*, 418 U.S. 87 (1974)).

[11]     *Id.* (quotation omitted).

[12]     *Id.* (quotation omitted).

[13]     *See Costello v. United States*, 350 U.S. 359, 363 (1956). *See also Alfonso*, 143 F.3d at 777 ("[T]he sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment.").

[14]     *See Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952); *United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d Cir. 1999).

-10-

and 'where the statutory language provides a clear answer, it ends there as well.'"[15] Courts must read congressional enactments according to their plain meaning unless such reading would lead to an absurd result.[16] Where no definition is provided for a term in the statute, courts first "consider the ordinary, common-sense meaning of the words."[17] Moreover, "a statute is to be considered in all its parts when construing any one of them."[18] If, and only if, the statutory text is ambiguous should the court turn to the legislative history to ascertain Congress's intent.[19] The rule of lenity applies only where there is an ambiguity in a criminal

---

[15] *Peralta-Taveras v. Gonzales*, — F.3d —, No. 06-2125, 2007 WL 1469423, at \*2 (2d Cir. May 22, 2007) (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999)). *Accord United States v. Razmilovic*, 419 F.3d 134, 136 (2d Cir. 2005) ("'Statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well.'" (quoting *United States v. Gayle*, 342 F.3d 89, 92 (2d Cir. 2003))).

[16] *See United States v. Schreiber*, 191 F.3d 103, 106 (2d Cir. 1999); *United States v. Hendrickson*, 26 F.3d 321, 336 (2d Cir. 1994).

[17] *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000).

[18] *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 36 (1998).

[19] *See Xiao Ji Chen v. United States Dep't of Justice*, 471 F.3d 315, 326 (2d Cir. 2006) (citing *Watt v. Alaska*, 451 U.S. 259, 266 (1981) ("The circumstances of the enactment of particular legislation may persuade a court that Congress did not intend words of common meaning to have their literal effect."); *United States v. Pabon-Cruz*, 391 F.3d 86, 98 (2d Cir. 2004) (noting "the need to consult . . . legislative history" when statutory language is ambiguous)). *See also Dauray*, 215 F.3d at 264 ("When the plain language and canons of statutory

-11-

statute and where resort to any and all other sources still results in a tie as to the

proper interpretation.[20]

## C.  Statute of Limitations

### 1.  In General

Where no statute speaks to the limitations period that applies for a

particular offense, "a 'catchall' statute operates" to supply a five-year statute of

limitations for noncapital offenses.[21]  That catchall statute, section 3282 of title 18

of the United States Code, provides, in pertinent part: "Except as otherwise

expressly provided by law, no person shall be prosecuted, tried, or punished for

any offense, not capital, unless the indictment is found or the information is

instituted within five years next after such offense shall have been committed."[22]

---

interpretation fail to resolve statutory ambiguity, [courts] [] resort to legislative
history.").

[20]     *See Johnson v. United States*, 529 U.S. 694, 713 n.13 (2000) ("Lenity
applies only when the equipoise of competing reasons cannot otherwise be
resolved."); *Sash v. Zenk*, 439 F.3d 61, 64 (2d Cir. 2006) ("The rule of lenity
concerns situations in which a legislature fails to give notice of the scope of
punishment by leaving 'a grievous ambiguity or uncertainty in the language and
structure of the [statute], such that even after a court has seized everything from
which aid can be derived, it is still left with an ambiguous statute.'" (quoting
*Chapman v. United States*, 500 U.S. 453, 463 (1991))).

[21]     *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143,
157 (1987) (citing 18 U.S.C. § 3282).

[22]     18 U.S.C. § 3282(a).

-12-

The parties do not dispute that section 3282 governs all of the counts at issue on the motions to dismiss.[23]

"Statutes of limitations in criminal cases normally begin to run when the crime is 'complete.'"[24] With respect to conspiracy offenses, the government must "allege and prove at least one overt act that occurred" within the statute of limitations.[25] If the indictment is not found by the last day of the statute of limitations, then the indictment will be time-barred unless the government can establish that it effectively tolled the statute of limitations.[26]

## 2. Section 3292 Tolling

Section 3292 of title 18 is titled "Suspension of limitations to permit

---

[23] Neither defendant moves to dismiss the false statement counts, which are indisputably timely.

[24] *United States v. Mercedes*, 287 F.3d 47, 54 (2d Cir. 2002) (quoting *Toussie v. United States*, 397 U.S. 112, 115 (1970)).

[25] *United States v. Milstein*, 401 F.3d 53, 71 (2d Cir. 2005). Moreover, "[f]oreseeable acts of one co-conspirator in furtherance of the conspiracy are attributable to all co-conspirators." *Id.* at 72 (citing *United States v. Ben Zvi*, 242 F.3d 89, 97 (2d Cir. 2001) (statute of limitations depends on timely overt act by either the defendant or a co-conspirator)). Absent evidence that defendants ceased to be co-conspirators, which is an affirmative defense, any overt act by any of the co-conspirators in furtherance of the conspiracy within the limitations period will make the conspiracy charges timely against all defendants.

[26] *See United States v. Florez*, 447 F.3d 145, 149 (2d Cir. 2006) (in the context of tolling under section 3290, "it is the government's burden to show that a defendant was 'fleeing from justice'" by a preponderance of the evidence).

-13-

United States to obtain foreign evidence" and provides, in pertinent part:

> (a)(1) Upon application of the United States, filed before return of an indictment, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country.
>
> * * *
>
> (b) Except as provided in subsection (c) of this section, a period of suspension under this section shall begin on the date on which the official request is made and end on the date on which the foreign court or authority takes final action on the request.
>
> (c) The total of all periods of suspension under this section with respect to an offense—
>
> > (1) shall not exceed three years; and
> >
> > (2) shall not extend a period within which a criminal case must be initiated for more than six months if all foreign authorities take final action before such period would expire without regard to this section.[27]

An official request is defined in the statute as "a letter rogatory, a request under a

treaty or convention, or any other request for evidence" made by a court or a

criminal law enforcement authority of the United States to a court or other

---

[27]  18 U.S.C. § 3292.

-14-

authority of a foreign country.[28]

## D. Conspiracy

The crime of conspiracy under section 371 of title 18 consists of an

agreement between two or more persons to commit a criminal offense, and an

overt act in furtherance of that agreement.[29] Section 371 provides, in pertinent

part:

> If two or more persons conspire either to commit any offense
> against the United States, or to defraud the United States, or any
> agency thereof in any manner or for any purpose, and one or more
> of such persons do any act to effect the object of the conspiracy,
> each shall be fined under this title or imprisoned not more than
> five years, or both.[30]

"The elements of a [section] 371 conspiracy are clearly established: (1) an

agreement between two or more persons to commit a specified federal offense,

(2) the defendant's knowing and willful joinder in that common agreement, and

(3) some conspirator's commission of an overt act in furtherance of the

---

[28]     *Id.* § 3292(d).

[29]     *See United States v. Ceballos*, 340 F.3d 115, 123 (2d Cir. 2003) ("In
order to prove a conspiracy in violation of 18 U.S.C. § 371, the government must
show that two or more persons entered into an agreement to commit an offense
against the United States and that an overt act in furtherance of the conspiracy was
committed.").

[30]     18 U.S.C. § 371.

-15-

agreement."[31] "Where the conspiracy involves a specific-intent crime, 'the government [must] establish beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute.'"[32]

## E. The Foreign Corrupt Practices Act

The Foreign Corrupt Practices Act of 1977, as amended (the "FCPA")[33] was enacted "to criminalize illicit payments to foreign public officials by United States businesses and individuals."[34] "The FCPA makes it illegal to bribe foreign government officials to obtain or retain business, or to direct business to another person."[35]

Section 78dd-2(a) of the FCPA provides, in pertinent part:

---

[31] *United States v. Snype*, 441 F.3d 119, 142 (2d Cir. 2006). *Accord Ceballos*, 340 F.3d at 123-24 ("In order to convict a given defendant of conspiracy, the government must prove that he knew of the conspiracy and joined it with the intent to commit the offenses that were its objectives, that is, with the affirmative intent to make the conspiracy succeed" (citations omitted)).

[32] *Ceballos*, 340 F.3d at 124 (quoting *United States v. Samaria*, 239 F.3d 228, 234 (2d Cir. 2001)).

[33] 15 U.S.C. § 78dd-1 *et seq.*

[34] *In re Grand Jury Subpoena dated August 9, 2000*, 218 F. Supp. 2d 544, 550 (S.D.N.Y. 2002) (citing 15 U.S.C. §§ 78m(b), (d)(1), (g)-(h), 78dd-2, 78ff (1997), as amended by the International Anti-Bribery and Fair Competition Act of 1998, 15 U.S.C. §§ 78dd-1 to 78dd-3, 78ff).

[35] *Id.* (citing 15 U.S.C. § 78dd-2(a)).

-16-

It shall be unlawful for any domestic concern, . . . or for any officer, director, employee, or agent of such domestic concern or any stockholder thereof acting on behalf of such domestic concern, to make use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to—

(1) any foreign official for purposes of—

(A)(i) influencing any act or decision of such foreign official in his official capacity, (ii) inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official, or (iii) securing any improper advantage; or

(B) inducing such foreign official to use his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality,

in order to assist such domestic concern in obtaining or retaining business for or with, or directing business to, any person . . . .[36]

The statute provides the following criminal penalties for violations of the FCPA:

Any natural person that is an officer, director, employee, or agent of a domestic concern, or stockholder acting on behalf of such domestic concern, who willfully violates subsection (a) or (i) of this section shall be fined not more than $100,000 or imprisoned not more than 5 years, or both.[37]

---

[36]  15 U.S.C. § 78dd-2(a).

[37]  *Id.* § 78dd-2(g)(2)(A).

-17-

## 1. Mens Rea

### a. Corruptly

The term "corruptly" is not defined in the FCPA. However, the Second Circuit has defined that term as it is used in the FCPA as follows: "The word 'corruptly' in the FCPA signifies, in addition to the element of 'general intent' present in most criminal statutes, a bad or wrongful purpose and an intent to influence a foreign official to misuse his official position."[38] The court added, however, that "there is nothing in that word or any thing else in the FCPA that indicates that the government must establish that the defendant in fact knew that his or her conduct violated the FCPA to be guilty of such a violation."[39]

### b. Willfully

The term "willfully" appears in the provision of the FCPA dealing with criminal penalties, as opposed to the section defining the prohibited conduct in which "corruptly" appears. The statute does not define willfully, nor has the

---

[38] *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. v. Schreiber*, 327 F.3d 173, 183 (2d Cir. 2003).

[39] *Id.*

Second Circuit defined the term as it is used in the FCPA.[40] The Second Circuit, however, has defined the term in the analogous securities context, where in order to establish a criminal violation, as opposed to civil violation, of the securities laws, the government "must show that the defendant acted willfully."[41] In that context, the court "defined willfulness as a realization on the defendant's part that he was doing a wrongful act under the securities laws in a situation where the knowingly wrongful act involved a significant risk of effecting the violation that has occurred."[42] Moreover, the Supreme Court has stated with regard to other criminal statutes, that "in order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'"[43]

---

[40] The Supreme Court has noted in other contexts that "the word 'willfully' is sometimes said to be 'a word of many meanings' whose construction is often dependent on the context in which it appears." *Bryan v. United States*, 524 U.S. 184, 191 (1998) (citation omitted).

[41] *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005) (citing 15 U.S.C. § 78ff(a) ("Any person who willfully violates any provision of this chapter . . . shall upon conviction be fined not more than $5,000,000, or imprisoned not more than 20 years, or both . . . .")).

[42] *Id.* (quotations and citations omitted).

[43] *Bryan*, 524 U.S. at 191-92 (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)). The Court also held that to establish "willful" violation of a statute did not require that the defendant know *which* statute he was violating, but rather only that the conduct was unlawful. In so holding, the Court distinguished

-19-

## 2. Business Nexus Element

The phrase "in order to assist such domestic concern in obtaining or retaining business for or with, or directing business to, any person" found in the FCPA is commonly referred to as the "business nexus element." There is no definition of obtaining or retaining business in the FCPA. Nor has the Second Circuit had occasion to define the contours of the business nexus element. The Fifth Circuit, however, recently addressed this element. In *United States v. Kay*, the Fifth Circuit, after what the court itself described as an "ad nauseum" review of the legislative history of the FCPA upon its finding the terms "obtaining or retaining business" ambiguous, held that "Congress intended for the FCPA to apply broadly to payments intended to assist the payor, either directly or indirectly, in obtaining or retaining business for some person."[44] The court noted

---

the statute at issue, which dealt with the sale of firearms without a license, from the Court's interpretation of "willfully" in two other contexts: cases involving willful violations of the tax laws and willful violations in the context of structuring cash transactions to avoid a reporting requirement, where the Court required the jury to find that the "defendant was aware of the specific provision . . . that he was charged with violating." *Id.* at 194. Both contexts, the Court explained, involve "highly technical statutes that presented the danger of ensnaring individuals engaged in apparently innocent conduct." No such concern exists here, and thus, like the sale of firearms without a license, there is no need to read into the FCPA an "exception to the traditional rule that ignorance of the law is no excuse."

[44]     359 F.3d 738, 755 (5th Cir. 2004).

that Congress's concern in enacting the FCPA was the prohibition of rampant

foreign bribery by domestic business entities, which included "both the kind of

bribery that leads to discrete contractual arrangements and the kind that more

generally helps a domestic payor obtain or retain business for some person in a

foreign country."[45] The court then held that Congress intended to prohibit "illicit

payments made to officials to obtain favorable but unlawful tax treatment."[46]

      The Fifth Circuit found that a broad reading of the business nexus

element was supported by narrow statutory exceptions to the FCPA: "by narrowly

defining exceptions and affirmative defenses against a backdrop of broad

applicability, Congress reaffirmed its intention for the statute to apply to payments

that even indirectly assist in obtaining business or maintaining existing business

operations in a foreign country."[47] The court's broad reading was also supported

by "Congress's intention to implement the [Organization of Economic

Cooperation and Development's Convention on Combating Bribery of Foreign

Public Officials in International Business Transactions], a treaty that indisputably

---

[45]    *Id.* at 755-56.

[46]    *Id.* at 756. *But see id.* ("It still must be shown that the bribery was intended to produce an effect — here, through tax savings — that would assist in obtaining or retaining business." (quotation omitted)).

[47]    *Id.*

-21-

prohibits any bribes that give an advantage to which a business entity is not fully entitled."[48]

I also find that the FCPA's business nexus element was intended to be construed broadly. I will address defendants' arguments as to the sufficiency of the Indictment below accordingly.

## F. The Travel Act

The Travel Act applies to any person or business who travels or uses the mail or any facility in interstate or foreign commerce with the intent to: (1) distribute the proceeds of any unlawful activity; or (2) commit any crime of violence to further any unlawful activity; or (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity.[49] A violation of the Travel Act occurs where that person or business thereafter performs or attempts to perform an unlawful activity, which includes violating the FCPA.[50] "To prove a violation of the Travel

---

[48]    *Id.*

[49]    *See* 18 U.S.C. § 1952.

[50]    *See id.* § 1952(b)(i) (defining "unlawful activity" as including "extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States" or any act which is indictable under section 1956 or 1957).

-22-

Act, the government [is] required to establish that [defendant]: (1) used a facility

of interstate or foreign commerce; (2) with intent to commit any unlawful activity .

. . ; and (3) thereafter performed an additional act to further the unlawful

activity."[51]

## G. Money Laundering

The crime of money laundering under section 1956 of title 18

prohibits the "transport[ation], transmi[ssion], or transfer[], or attempt[] to

transport, transmit, or transfer [of] a monetary instrument or funds from a place in

the United States to or through a place outside the United States or to a place in

the United States from or through a place outside the United States . . . with the

intent to promote the carrying on of a specified unlawful activity."[52] The elements

of a money laundering offense do not include, or even implicate, the capacity to

commit the underlying unlawful activity.[53] Conspiracy to commit money

---

[51] *United States v. Salameh*, 152 F.3d 88, 152 (2d Cir. 1998) (citing
*United States v. Jenkins*, 943 F.2d 167, 172 (2d Cir. 1991)).

[52] 18 U.S.C. § 1956(a)(2)(A).

[53] *See United States v. Cruz*, 993 F.2d 164, 167 (8th Cir. 1993) ("For the
government to prove a violation of section 1956(a)(1)(A)(i), the evidence must
establish (1) that the defendant conducted a financial transaction which involved
the proceeds of unlawful activity; (2) that he knew that the property involved in
the transaction was proceeds of some form of specified unlawful activity; and (3)
that he intended to promote the . . . unlawful activity." (quotation marks and

-23-

laundering is also criminalized under section 1956.[54]

## IV. DISCUSSION

### A. Statute of Limitations

The majority of the conduct charged in the Indictment occurred
between March and July 1998. Accordingly, the five-year statute of limitations
for those offenses would have run sometime between March and July 2003.
Because the Indictment was not returned until May 12, 2005, all of those offenses
are time-barred unless the government can demonstrate that the statute of
limitations was tolled. Here, the government attempts to utilize section 3292 to
toll the statute of limitations based on the government's official requests for
foreign evidence from the Netherlands and Switzerland.

### 1. Suspension Period Start Date: Official Request

Defendants argue that in order to suspend the statute of limitations
under section 3292, the government must make the necessary application to the

alterations omitted)).

[54]    Section 1956(h) provides:

> Any person who conspires to commit any offense defined in this
> section or section 1957 shall be subject to the same penalties as
> those prescribed for the offense the commission of which was the
> object of the conspiracy.

-24-

Court before the five-year limitations period expires. Defendants acknowledge
that the section 3292 tolling period begins on the date of the official request to a
foreign government — here October 29, 2002 — the date of the request for
evidence to the Netherlands.[55] Defendants argue, however, that because the
limitations period may not be tolled absent a court order, only the court's order can
*suspend the running* of the statute of limitations. Accordingly, defendants argue
the statute must still be running at the time of the application to the court for there
to be a suspension of the limitations period. Defendants rely on legal and lay
dictionary definitions of "suspend" to reach the result that one cannot "suspend the
running"[56] of the statute after the statute has already expired. In opposition, the
government argues that because the statute provides that the *"period of
suspension"* begins on the date of the official request to the foreign government,
rather than on the date that the court grants the tolling application, the government
may invoke section 3292 so long as the official request is made before the statute
of limitations period expires.

At the outset, I am strongly inclined to agree with defendants that the

---

[55]    The government's request to Switzerland was dated January 13, 2003,
but this date is irrelevant for purposes of beginning the tolling period.

[56]    18 U.S.C. § 3292(a)(1).

-25-

plain meaning of the statute's provision that "the district court ... shall suspend the *running* of the statute of limitations" is unambiguous and requires that the application to the court be made and the court's order be issued before the statute of limitations has run, which would end the matter. However, there is other language that is in tension with those terms and arguably renders the statute ambiguous. Section 3292 states in pertinent part: "Upon application of the United States, *filed before return of an indictment*, ... the district court ... shall *suspend the running of the statute of limitations* for the offense . . . ."[57] The two clauses that are in tension are "before return of an indictment" and "suspend the running of the statute of limitations." The former implies that the only time restraint placed on the government's application to the court is that it must be made before the grand jury returns the indictment. The latter implies that in order for there to be a suspension the statute of limitations must *still be running* at the time that both the application is made and the court grants the application. In light of this tension, and in an abundance of caution, I find that section 3292 is ambiguous, and turn to its legislative history for guidance on its proper interpretation.

The legislative history of section 3292 is sparse. The legislative record states that the Bill of which section 3292 was a part "permits a federal

---

[57] *Id.* (emphasis added).

court, upon application of the prosecutor, to suspend the running of the statute of limitations for such time as is necessary (up to 3 years) to obtain evidence from a foreign country" and also that section 3292 "authorizes a federal court, upon application of a federal prosecutor that is made before the return of an indictment and that indicates that evidence of an offense is located in a foreign country, to suspend the running of the applicable statute of limitation."[58] The fact that the legislative history twice refers to the authority of the court to order the suspension reinforces the principle that only court action will toll the statute of limitations.

A separate subsection of section 3292 provides further insight. Section 3292(b) provides that the tolling period "shall begin on the date on which the official request is made."[59] Congress addressed the *calculation* of the tolling period in subsection 3292(b) — a different subsection than the one at issue here, which sets forth how the government can *obtain* the toll. Reading the statute as a whole, as I must, I find that the structure of section 3292 strongly supports the interpretation that the court order itself — not the official request to the foreign government — tolls the statute of limitations and that the toll must be ordered before the statute of limitations expires.

---

[58] H.R. Rep. No. 98-907 (1984), reprinted in 1984 U.S.C.C.A.N. 3578.

[59] *Id.* § 3292(b).

-27-

As a result, the words of the statute itself, another subsection of the statute and the legislative history of the statute all confirm that section 3292 only permits a court to suspend the running of the statute of limitations when the government applies for and obtains a suspension order prior to the expiration of the limitations period. The Court's reading is further supported by the policy of statutes of limitations and another canon of statutory construction, the doctrine of constitutional avoidance.

*First*, the Court's understanding of section 3292 is in line with the general policy underlying statutes of limitations for criminal offenses. "Although, in some instances, criminal statutes of limitations operate to preclude the prosecution of criminal acts, they 'have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity.'"[60] Moreover, criminal statutes of limitations ensure the defendant's right to a fair trial, as they are implemented by the legislature to ensure 'the repose of society and the protection of those who may (during the limitation) . . . have lost their means of defense.'"[61] "Additionally, they create a means of predictability by

---

[60] *United States v. Torres*, 318 F.3d 1058, 1062-65 (11th Cir. 2003) (quoting *Toussie v. United States*, 397 U.S. 112, 114-15 (1970)).

[61] *Id.* (quoting *United States v. Meador*, 138 F.3d 986, 994 (5th Cir. 1998)).

-28-

specifying the point at which 'a defendant's right to a fair trial would be prejudiced.'"[62] These policies weigh in favor of reading section 3292 to require that the government's application and the court's order be made not only before the return of the indictment, but also before the statute of limitations has run.

*Second*, the Court's reading is supported by the doctrine of constitutional avoidance in statutory construction. To read section 3292 as the government suggests would permit section 3292 to be used as a tool to revive time-barred offenses and would treat the legislatively-mandated court procedure as a post-hoc judicial rubber-stamp for prosecutorial actions. Not only does such a result not comport with this Court's understanding of the statute and its purpose, but such a reading would raise several serious constitutional questions of Due Process and retroactivity under the Ex Post Facto Clause. Under the doctrine of constitutional avoidance, however, I need not reach those issues. "[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [the court's] duty is to adopt the latter."[63] The Court's reading is in line with this principle and saves section 3292 from a potentially meritorious attack on

---

[62]     *Id.* (quoting *Meador*, 138 F.3d at 994).

[63]     *Jones v. United States*, 529 U.S. 848, 857 (2000).

-29-

constitutional grounds.

The Court is aware that two courts — the Ninth Circuit and the
District of Columbia following the Ninth Circuit — have addressed this issue and
reached the opposite conclusion than this Court reaches here.[64] However, a careful
review of both decisions reveals that those courts did not engage in any
meaningful analysis of the statute, nor did they engage in any review of the
legislative history. Their analyses began and ended with a recitation of section
3292(b)'s decree that the period of suspension "shall begin on the date on which
the official request is made."[65] As discussed above, however, that is not the
subsection at issue here. This Court is well aware that the statute provides for the
tolling period to begin on the date of the request to the foreign government. But
this is quite different from a finding that the official request itself *suspends* the
statute of limitations. These decisions either conflated sections 3292(a)(1) and
3292(b) or ignored section 3292(a)(1) altogether in order to reach their result.
Either approach violates the well-established principle of statutory construction
that a statute must be "considered in all its parts when construing any one of

---

[64]    *See United States v. Bischel*, 61 F.3d 1429 (9th Cir. 1995); *United
States v. Neil*, 940 F. Supp. 332 (D.D.C.), *vacated in part on other grounds*, 952 F.
Supp. 831 (D.D.C. 1996).

[65]    18 U.S.C. § 3292(b).

them."[66] Moreover, that reading would permit a legislative enactment to be used to revive time-barred offenses, which raises significant Ex Post Facto concerns.[67] Thus, after careful consideration, I disagree with the result reached by the Ninth Circuit and the District of Columbia.[68]

Because the government did not move to "suspend the running" of the statute of limitations until after it had expired, the government is not entitled to any tolling under section 3292. As a result, all of the counts except the false statement counts are time-barred and must be dismissed. It should be noted that in practice, this problem can easily be avoided — and easily could have been avoided in this case. The government waited almost nine full months after making the official request to the Netherlands before applying for a section 3292 suspension. Had the government applied to the court anytime before March 2003, the Indictment would have been timely, as discussed below. But the mere fact that the government could have easily avoided this dismissal does not change the result

---

[66] *Lexecon*, 523 U.S. at 36.

[67] *See, e.g.*, *Stogner v. California*, 539 U.S. 607, 616 (2003) ("[I]t [is] well settled that the Ex Post Facto Clause forbids resurrection of a time-barred prosecution.").

[68] Interestingly, there has been no reported decision on this question since 1996.

-31-

here. Statutes of limitations must be enforced, even where it deprives society of its ability to prosecute otherwise viable criminal offenses; "that is the price we pay for repose."[69]

## 2. Suspension Period End Date: Final Action

Even though the government cannot use section 3292 tolling, for purposes of completeness, I continue the section 3292 analysis as if the government's application were timely. The statute provides that the tolling period would have begun on the date of the government's request for evidence, which here would be October 29, 2002, when the request was sent to the Netherlands.[70] The next question to address, then, is when the tolling period would end, *i.e.*, when final action took place.

Section 3292 does not define "final action." Nor has the Second Circuit yet spoken as to the contours of the term. Other Circuits have addressed what constitutes final action for the purposes of ending the suspension period under section 3292, holding that final action occurs when the foreign government

---

[69]     *Meador*, 138 F.3d at 994.

[70]     The government's request to Switzerland was dated January 13, 2003, but the date of the earlier request governs the beginning of the tolling period.

makes a "dispositive response" to the request.[71] A "dispositive response" is made

when the foreign government has acted on every item in the official request,

including issuing a certificate of authenticity if such was requested.[72] Moreover,

where the United States government has made official requests to more than one

foreign government, final action occurs for purposes of ending the suspension

period when *all* of the foreign governments have made a dispositive response to

the respective requests.[73]

The parties dispute when final action took place on the official

requests. The government argues that final action did not occur until November 8,

---

[71]    *United States v. Hagege*, 437 F.3d 943, 956 (9th Cir.) ("'[F]inal
action' for purposes of [section] 3292 means a dispositive response by the foreign
sovereign to both the request for records and for a certificate of authenticity of
those records, [when] both [a]re identified in the 'official request.'" (quoting
*United States v. Bischel*, 61 F.3d 1429, 1433 (9th Cir. 1995))), *cert. denied*, 127 S.
Ct. 85 (2006); *United States v. Torres*, 318 F.3d 1058, 1062 (11th Cir. 2003)
("'[F]inal action' for the purposes of [section] 3292(b) occurs when a foreign court
or authority provides a dispositive response to each of the items listed in the
government's official request for information."). *See also United States v.
Meador*, 138 F.3d 986, 993 (5th Cir. 1998) (final action occurred on the date of
the letter from foreign government advising that it had completed action on the
United States government's request).

[72]    *Hagege*, 437 F.3d at 956; *Torres*, 318 F.3d at 1062.

[73]    *See, e.g.*, 18 U.S.C. § 3292 (stating that the suspension period is
limited to six months where "*all* foreign authorities take final action before [the
statute of limitations] would expire without regard to this section" (emphasis
added)).

-33-

2005, the date of a letter from the Netherlands transmitting documents to the

United States in response to the official request (the "November 8 letter").[74]

Defendants dispute the November 8, 2005 date based on the government's

omission of the enclosures to the November 8 letter, which defendants argue

reveals that it is "likely that the missing attachments are letters showing that the

Dutch authorities previously completed their work on the government's request."

On May 25, 2007, the Court ordered the government to produce the enclosures to

the November 8 letter. The government produced those documents on May 30,

2007. After reviewing that submission, I find that final action was taken by the

Netherlands on or after November 8, 2005.[75] Because that date is more than three

---

[74]     *See* November 8, 2005 Letter, Berke Decl. Ex. J (letter from the
Netherlands government to the OIA, stating: "With reference to your letter of
October 29, 2002, I send you enclosed Copies of documents attesting to the
execution of the request for assistance concerning Victor [sic] Kozeny.").

[75]     Although the majority of documents are in Dutch, it is clear from the
contents that the documents produced are responsive to the official request dated
October 29, 2002 based on the frequency that the names of individuals listed in the
official request appear in the documents produced. Moreover, this finding is
buttressed by the sworn testimony of Judith Friedman that confirms documents
were sent by the Netherlands on November 8, 2005 and received at OIA on
November 15, 2005, and that "[p]rior to that time, the United States government
had not received any responsive documents from the Netherlands," despite
inquiries by OIA regarding the status of the official request. Declaration of Judith
H. Friedman, OIA employee, ¶ 6, attached as Ex. A to the Declaration of Jonathan
S. Abernethy, Assistant United States Attorney, in opposition to defendants'
motions to dismiss the Indictment.

years after the official request was made, however, the suspension period would be

capped at three years and would have expired on October 29, 2005.[76] Because the

Indictment was returned on May 12, 2005, before the statute of limitations would

have run, the Indictment would have been timely if the government were entitled

to invoke section 3292.[77]

## B. Failure to Adequately Charge a Federal Offense

---

[76] *See* 18 U.S.C. § 3292(c)(1). There is some dispute as to whether, and if so, when, the Swiss took final action on the Swiss requests. However, the date of Swiss final action is irrelevant in this case because even if the Swiss final action preceded the Dutch final action, the date of the Dutch final action would govern the end date for the toll, which applied to both official requests. Even if the Swiss final action followed the Dutch final action, the three year cap would apply.

[77] Defendants also argue that the sealing of the Indictment for almost five months lacked a proper purpose and that as a result, the Indictment should be "found" for statute of limitations purposes on the date of unsealing, namely October 6, 2005. I need not address this argument, however, because even if the Indictment were found on October 6, 2005, with the benefit of section 3292 the Indictment would still be timely because the statute of limitations would have been tolled through October 29, 2005. In any event, the government asserts that the Indictment was sealed in order to facilitate the arrest of Kozeny, who was at large in the Bahamas and posed a flight risk. This is a proper purpose for sealing, and keeping sealed, an indictment. *See United States v. Leaver*, 358 F. Supp. 2d 255, 266 (S.D.N.Y. 2004) (stating that "[f]acilitation of arrest, where the accused's whereabouts are unknown, is a proper purpose for sealing, as is the fear that an accused will become a fugitive if he learns of the charges" and finding that "the Government certainly had a good faith belief that [defendant] might conceal himself if he learned of the indictment" (citing *United States v. Srulowitz*, 819 F.2d 37, 40 (2d Cir. 1987); *United States v. Slochowsky*, 575 F. Supp. 1562, 1569 (E.D.N.Y. 1983))).

### 1. Conspiracy to Violate the FCPA

Pinkerton moves to dismiss Count One of the Indictment, which charges him with conspiracy to violate the FCPA and the Travel Act on the grounds that the Indictment fails to allege that he possessed the specific intent to violate the FCPA.[78] Pinkerton also argues that the Indictment fails to allege Pinkerton's intent that a future bribe be paid. This argument has no merit. The Indictment alleges that the defendants, including Pinkerton, "agreed . . . to commit offenses against the United States; to wit, violations of (a) the FCPA . . . ."[79] Moreover, the Indictment alleges that Pinkerton joined the conspiracy with the knowledge that bribes had been paid and would continue to be paid to Azeri officials in exchange for ensuring defendants' participation in the privatization of SOCAR.[80] Pinkerton's intent to join the conspiracy and an overt act by any co-conspirator is sufficient to allege a conspiracy. Taken as a whole, the allegations

---

[78]  *See* Memorandum of Law in Support of David B. Pinkerton's Motion to Dismiss the Indictment and for a Bill of Particulars ("Pinkerton Mem.") at 7. Bourke does not join Pinkerton's motion to dismiss on this issue and accordingly, Count One is adequately charged as to Bourke. *See* Memorandum of Law in Support of Defendant Frederic A. Bourke, Jr.'s Pretrial Motions ("Bourke Mem.") at 1 n.1.

[79]  Indictment ¶ 63.

[80]  *See id.* ¶¶ 19, 21.

-36-

in the Indictment are plainly sufficient to withstand a motion to dismiss. Whether the evidence ultimately will be sufficient to support a conviction is a separate issue not before the Court.

## 2. Substantive Violation of FCPA

Defendants move to dismiss all of the substantive FCPA counts against them on the ground that the Indictment fails to allege the mens rea element of a FCPA offense or conduct that can be criminalized under the business nexus element.[81] These arguments are also without merit.

### a. Mens Rea

There is no dispute that the Indictment adequately alleges that defendants acted corruptly in violation of the FCPA. However, defendants argue that the failure of the government to include an express allegation in the substantive FCPA counts that defendants acted willfully, which is necessary in order to impose criminal penalties under the FCPA, is fatal to the Indictment. The government concedes willfulness must be proven and that there is no express allegation of willfulness in the substantive counts of the Indictment, but the

---

[81] Pinkerton moves to dismiss Count Five, which is the only substantive FCPA count against him. *See* Pinkerton Mem. at 10. Bourke moves to dismiss Counts Four, Five, Ten, Eleven and Twelve, which are all of the substantive FCPA counts against him. *See* Bourke Mem. at 1 n.1.

government argues that such omission does not merit dismissal of the substantive FCPA counts.

I find that the omission of the word willfully from the substantive FCPA is a technical defect that does not prejudice defendants and is not fatal to those counts. For purposes of assessing the sufficiency of the Indictment — as opposed to the sufficiency of proof — I find that the term "willfully" need not be specifically included in the substantive counts in order to adequately charge the criminal violation of the FCPA. "Convictions are no longer reversed because of minor and technical deficiencies which did not prejudice the accused."[82] Defendants cannot seriously contend that their defense will be prejudiced or that they are not sufficiently informed of the charges against them for purposes of asserting a double jeopardy defense merely because the Indictment did not use the magic word "willfully" in certain paragraphs. "[I]mperfections of form [in an indictment] that are not prejudicial are disregarded, and common sense and reason prevail over technicalities."[83]

One of the cases cited by defendants provides instruction on this

---

[82] *United States v. Goodwin*, 141 F.3d 394, 400-01 (2d Cir. 1997) (citing *United States v. Wydermyer*, 51 F.3d 319, 324 (2d Cir. 1995)).

[83] *Id.* at 401.

-38-

issue. In *United States v. Hernandez*, the Second Circuit recognized that "citation to a statutory section alone is not sufficient to cure a defective indictment that fails to allege all the elements of an offense" and "each count of an indictment must be treated as if it were a separate indictment, and that the validity of a count cannot depend upon the allegations contained in any other count not expressly incorporated."[84] Nevertheless, the court found that the failure to include the words "with intent to distribute" in the count was not a ground for dismissal. Rather, the court found that "[r]eading the indictment in its entirety . . . the combination of the precise language used in the caption; [the] Count['s] citation to . . . the statute allegedly violated; and the large quantity of heroin alleged in [that] Count, from which, even among four individuals, one may infer an intent to distribute, provided [defendant] with adequate notice of the nature of the crimes charged against him under [that] Count."[85]

As discussed above, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate

---

[84]    980 F.2d 868, 871 (2d Cir. 1992).

[85]    *Hernandez*, 980 F.2d at 871-72. *See also id.* at 871 n.3 (noting that although the "quantity of narcotics alleged in an indictment is not an element of the offense, . . . it puts the defendant on notice of the penalty provisions he may face, and the quantity may indicate the conduct or transaction that is the basis of the charge").

-39-

terms) of the alleged crime."[86] Here, the counts tracked the statutory language for the violation as contained in the "prohibition" section of the FCPA.[87] In addition, the substantive FCPA count expressly cited 18 U.S.C. § 78dd-2 as supplying the offense with which defendants are charged. Moreover, the very fact that defendants were indicted made clear to them that the criminal penalty provision would be applied, which requires proof of a willful violation.[88] As a result, defendants here, like in *Hernandez*, were on notice that they were being charged with a criminal violation of 18 U.S.C. § 78dd-2. In addition, although not expressly incorporated in the substantive FCPA counts, the "Statutory Allegations" section of the Indictment contain allegations that defendants "unlawfully, *willfully*, and knowingly combined, conspired, confederated, and agreed together and with each other *to commit offenses against the United States*; to wit, violations of (a) the FCPA, Title 15, United States Code, Section 78dd-2; and (b) the Travel Act, Title 18, United States Code, Section 1952(a)(3)(A)"[89] and that defendants "unlawfully, *willfully*, and knowingly, would and did travel in

---

[86]     *Alfonso*, 143 F.3d at 776 (citation omitted).

[87]     15 U.S.C. § 78dd-2(a).

[88]     *See id.* § 78dd-2(g)(2)(A).

[89]     Indictment ¶ 63 (emphasis added).

-40-

interstate and foreign commerce and use the mail and facilities in interstate and foreign commerce, *with intent to otherwise promote, manage, establish, carry on . . . an unlawful activity, namely, violations of the anti-bribery provisions of the FCPA, 15 U.S.C. § 78dd-2 . . . ."*[90]

At trial, the jury will be instructed on the issue of willfulness and defendants will not be convicted of a criminal violation of the FCPA without a finding of willfulness. The absence of that word from the charging portion of the Indictment does not merit dismissal of those offenses.

### b.     Obtain or Retain Business

Defendants argue that the Indictment does not adequately allege the business nexus element insofar as the alleged bribes were not made for the purpose of obtaining or retaining business as required by the FCPA. The Indictment alleges that the bribes were paid to the Azeri Officials in order to ensure not only the privatization, but defendants' participation in the privatization, which would permit defendants to obtain a large stake in a significant asset, SOCAR. These are not the type of "grease" payments that Congress intended to

---

[90]     *Id.* ¶ 65 (emphasis added).

exclude from coverage by the FCPA.[91] In light of the broad construction that

Congress intended courts to apply to the business nexus element, I find that these

alleged payments, made for the purpose of inducing foreign officials to make

available a lucrative investment opportunity, fall within the ambit of the conduct

Congress intended to prohibit under the FCPA. Accordingly, the Indictment

adequately charges an FCPA offense.

## 3. Travel Act

Defendants' only claimed deficiency regarding the Travel Act counts

are based on the asserted insufficiency of the Indictment as to the FCPA counts.

Because I have found that the Indictment adequately charges violations of the

FCPA, the Travel Act counts are also sufficient.[92]

## 4. Money Laundering

---

[91] "Grease" or "facilitating" payments are defined in the FCPA as "any facilitating or expediting payment to a foreign official . . . the purpose of which is to expedite or to service the performance of a routine governmental action by a foreign official." 15 U.S.C. § 78dd-1(b). "[R]outine governmental action" is defined as actions that are ordinarily and commonly performed by a foreign official, such as obtaining permits or licenses, visas, police protection, mail services or inspections. 15 U.S.C. § 78dd-1(f)(3)(A). *See generally Kay*, 359 F.3d at 747-50 (discussing the statutory grease exception).

[92] *Cf. Dooley v. United Techs. Corp.*, 803 F. Supp. 428, 439-40 (D.D.C. 1992) ("[B]ecause the [] defendants could not have violated the FCPA, they could not have violated the Travel Act.").

Pinkerton purports to move to dismiss the money laundering counts

against him (Counts Twenty-One and Twenty-Four) for failure to adequately

charge a federal crime.[93] However, the only reference to the money laundering

offenses in the memorandum of law is contained in a footnote, arguing that the

"failure to allege intent to violate the FCPA is, in turn, fatal to those counts

involving violations of other statutes for which a violation of the FCPA is a

necessary predicate."[94] This is an incorrect statement of the law, but I need not

address this issue because I have found that the Indictment sufficiently alleges the

FCPA offenses. Thus, there is no remaining challenge to the money laundering

counts.

---

[93]     Bourke does not join Pinkerton's motion to dismiss for failure to
adequately charge an offense as to the money laundering counts. *See* Bourke
Mem. at 1 n.1.

[94]     Pinkerton Mem. at 9 n.6.

## V. CONCLUSION

For the reasons set forth above, all of the counts in the Indictment

except the false statement counts are time-barred, and Pinkerton's and Bourke's

motions to dismiss are granted. The Clerk of the Court is directed to close these

motions [Nos. 72 and 75 on the Docket Sheet]. A conference is scheduled for July

17, 2007, at 4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           June 21, 2007

**For Frederic A. Bourke, Jr.:**

Dan K. Webb, Esq.
J. David Reich, Esq.
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

Robert J. Cleary, Esq.
Matthew S. Queler, Esq.
Emily Stern, Esq.
Proskauer Rose LLP
1585 Broadway
New York, New York 10036
(212) 969-3000

**For David B. Pinkerton:**

Barry H. Berke, Esq.
Paul Schoeman, Esq.
Jeffrey S. Trachtman, Esq.
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

**For the Government:**

Jonathan S. Abernethy
Assistant United States Attorney
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2232

Mark F. Mendelsohn
   Deputy Chief, Fraud Section
Robertson Park
   Assistant Chief, Fraud Section
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-1721/4335