UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/13/09
```

-------------------------------------------------- X

UNITED STATES OF AMERICA

   - against -

VIKTOR KOZENY and FREDERIC
BOURKE, JR.,

                Defendants.

-------------------------------------------------- X

**OPINION AND ORDER**

**05 Cr. 518 (SAS)**

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

After a five-week trial, defendant Frederic Bourke was convicted of conspiring to violate the Foreign Corrupt Practices Act ("FCPA") under 18 U.S.C. § 371 and making false statements in violation of 18 U.S.C. § 1001.[1] He now moves pursuant to Federal Rule of Criminal Procedure 29 for entry of a judgment of acquittal on both counts, or alternatively, pursuant to Rule 33 for a new trial. For the reasons that follow, his motions are denied.

---

[1]    *See* 7/10/09 Verdict Sheet; 5/26/09 Superseding Indictment ¶¶ 44-48; 54-55.

## II.    BACKGROUND

### A.    Facts[2]

SOCAR is the state-owned oil company of the Republic of Azerbaijan

("Azerbaijan").[3]  In the mid-1990s, Azerbaijan began a program of privatization.[4]

The program gave the President of Azerbaijan, Heydar Aliyev, discretionary

authority as to whether and when to privatize SOCAR.[5]  Bourke, co-defendant

Viktor Kozeny, and others conspired to violate the FCPA by agreeing to make

payments to Azeri officials to encourage the privatization of SOCAR and to permit

them to participate in that privatization.[6]  The payments included, among other

things, cash bribes, the gift of a two-thirds interest in the privatization venture, and

assistance with obtaining a medical appointment, visas, and college admission in

the United States.[7]

---

[2]      The facts in this case are complex, and it is unnecessary to recite them here.  Instead of summarizing the voluminous testimony at trial, any facts pertinent to Bourke's motions will be addressed in the discussion section of this Opinion.

[3]      *See* Trial Transcript ("Tr.") at 169:16-17.

[4]      *See id.* at 181:23-182:10.

[5]      *See id.* at 203:2-5.

[6]      *See id.* at 432:1-5.

[7]      *See id.* at 450:8-22; 432:6-434:25; 574:15-575:21.

## B.   Procedural History

On May 12, 2005, in a sealed indictment, the Government charged

Bourke with various offenses related to the payment of bribes to Azeri officials.

In an Opinion and Order dated June 21, 2007, this Court granted Bourke's motion

to dismiss certain of the counts against him on the ground that they were time-

barred.[8]  In a Memorandum Opinion and Order dated July 16, 2007, the Court

reinstated the conspiracy to violate the FCPA count, the substantive FCPA count,

and the money laundering conspiracy count.[9]  The false statements count against

Bourke was not dismissed in the June Opinion and Order and therefore also

remained.[10]  On May 5, 2009, a grand jury returned a superseding indictment that

omitted the charges that the Court had dismissed.[11]  On the eve of trial, after the

Government decided not to proceed with the substantive FCPA count, a grand jury

returned a second superseding indictment that omitted the substantive FCPA

charge.[12]

---

[8]    *See United States v. Kozeny*, 493 F. Supp. 2d 693, 714 (S.D.N.Y. 2007).

[9]    *See id.* at 714-15.

[10]    *See id.* at 714.

[11]    *See* 5/5/09 Superseding Indictment.

[12]    *See* 5/26/09 Superseding Indictment.

3

Trial on the three remaining counts – conspiracy to violate the FCPA, conspiracy to engage in money laundering, and the making of false statements – commenced on June 1, 2009 and lasted approximately five weeks.  In a July 6, 2009 Opinion and Order, this Court denied Bourke's Rule 29 motion for judgment of acquittal, finding that the Government had presented sufficient evidence to enable a reasonable juror to conclude beyond a reasonable doubt that Bourke was guilty of all counts.[13]

On July 10, 2009, the jury convicted Bourke of the conspiracy to violate the FCPA count and the false statements charge.[14]  Bourke was acquitted, however, of the money laundering conspiracy count.[15]  Bourke now moves the Court to enter a judgment of acquittal with respect to the counts upon which he was convicted or, in the alternative, to grant him a new trial.

## III.    LEGAL STANDARD

### A.    Rule 29

To prevail on a Rule 29 motion, a defendant must show that "the

---

[13]    *See United States v. Kozeny*, — F. Supp. 2d —, 2009 WL 1940897, at *6 (S.D.N.Y. July 6, 2009).

[14]    *See* 7/10/09 Verdict Sheet.

[15]    *See id.*

4

evidence is insufficient to sustain a conviction."[16] "[A] defendant making an insufficiency claim bears a very heavy burden."[17] "The ultimate question is not whether [the court] believe[s] the evidence adduced at trial established [the defendant's guilt beyond a reasonable doubt], but whether *any rational trier of fact could so find*."[18] "In other words, the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."[19]

A court must grant a motion under Rule 29 if there is "no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt."[20] "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable

---

[16]     Fed. R. Crim. P. 29(a).

[17]     *United States v. Desena*, 287 F.3d 170, 177 (2d Cir. 2002). *Accord United States v. Best*, 219 F.3d 192, 200 (2d Cir. 2000).

[18]     *United States v. Eppolito*, 543 F.3d 25, 45-46 (2d Cir. 2008) (emphasis in original). *Accord Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

[19]     *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quotation marks and citation omitted). *Accord United States v. Wexler*, 522 F.3d 194, 209 (2d Cir. 2008).

[20]     *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006) (quotation omitted).

doubt."[21]

In considering the sufficiency of the evidence, the court must "view all of the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor."[22]  A court must analyze the pieces of evidence not separately, in isolation, but together, in conjunction with one another.[23]  Accordingly, a court must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from the others."[24]

"The assessment of witness credibility lies solely within the province of the jury, and the jury is free to believe part and disbelieve part of any witness's testimony . . . ."[25]  "'[T]he task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing court.'"[26]  Furthermore, "'the

---

[21]     *United States v. Hawkins*, 547 F.3d 66, 71 (2d Cir. 2008).

[22]     *United States v. Ware*, 577 F.3d 442, 447 (2d Cir. 2009).

[23]     *See United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000).

[24]     *Guadagna*, 183 F.3d at 130.  *Accord United States v. Reyes*, 302 F.3d 48, 53 (2d Cir. 2002) ("[W]e consider the evidence as a whole.").

[25]     *Ware*, 577 F.3d at 447.

[26]     *United States v. Khedr*, 343 F.3d 96, 104 (2d Cir. 2003) (quoting *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001)).

6

jury's verdict may be based on entirely circumstantial evidence.'"[27]  Because the

jury is entitled to choose which inferences to draw, the Government, in presenting

a case based on circumstantial evidence, "need not 'exclude every reasonable

hypothesis other than that of guilt.'"[28]  But "'a conviction based on speculation and

surmise alone cannot stand.'"[29]

### B.    Rule 33

Rule 33(a) provides that "[u]pon the defendant's motion, the court

may vacate any judgment and grant a new trial if the interest of justice so

requires."[30]  "This rule 'confers broad discretion upon a trial court to set aside a

jury verdict and order a new trial to avert a perceived miscarriage of justice.'"[31]

"[B]efore ordering a new trial pursuant to Rule 33, a district court must find that

---

[27]     *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008) (quoting *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995)).

[28]     *Guadagna*, 183 F.3d at 130 (quoting *Holland v. United States*, 348 U.S. 121, 139 (1954)); *Reyes*, 302 F.3d at 56 (by "discount[ing] evidence of guilty knowledge entirely because there were possible . . . innocent explanations for [defendant's] conduct," the district court "failed to view the evidence in the light most favorable to the [G]overnment"); *Autuori*, 212 F.3d at 114 ("[T]he [G]overnment need not negate every theory of innocence.").

[29]     *Santos*, 541 F.3d at 70 (quoting *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994)).

[30]     Fed. R. Crim. P. 33(a).

[31]     *United States v. Polouizzi*, 564 F.3d 142, 159 (2d Cir. 2009) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)).

there is 'a real concern that an innocent person may have been convicted.'"[32] "The

test is whether "it would be a manifest injustice to let the guilty verdict stand."[33]

## IV.   DISCUSSION

### A.   Insufficiency of Evidence

#### 1.   Count One – Conspiracy to Violate the FCPA or Travel Act

Bourke argues that the Government presented insufficient evidence to

establish beyond a reasonable doubt that he had actual knowledge of the bribery.[34]

However, Bourke misconstrues the knowledge that a jury must find he had in order

to be convicted of the crime of conspiracy.  The Government must prove that

Bourke had knowledge of the *object of the conspiracy*, which was to violate the

FCPA, not that bribes had, in fact, been paid.  Indeed, a defendant can be convicted

of conspiracy even if the object of the conspiracy – in this case, the making of

corrupt payments in return for the privatization of SOCAR – is never fully

---

[32]      *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)).

[33]      *Sanchez*, 969 F.2d at 1414 (quotations omitted).

[34]      *See* Memorandum of Law in Support of Defendant Frederic Bourke, Jr.'s Post-Trial Motion for Entry of a Judgment of Acquittal Pursuant to Fed. R. Crim. P. 29 or for a New Trial Pursuant to Fed. R. Crim. P. 33 ("Bourke Mem.") at 29.

consummated.[35]

There was ample circumstantial evidence that Bourke had actual knowledge of the object of the conspiracy. For instance, Amir Farman-Farma, who was employed by Minaret[36] and became familiar with Bourke during the course of the privatization venture, testified that he had asked Bourke in a December 1998 conversation how Kozeny had justified the dilution of Oily Rock shares as a result of the capital share increase.[37] Bourke had replied that he had been told by Kozeny that the dilution was "a necessary cost of doing business" and that "he had issued or sold shares to new partners who would maximize the chances of the deal going through, the privatization being a success."[38] Robert

---

[35]   *See Wexler*, 522 F.3d at 214 ("[T]he law is well established that a [] conspiracy requires proof only of the parties' mutual agreement, not the consummation of any particular object.").

[36]   Minaret was an investment bank that Kozeny had established in Azerbaijan. *See* Tr. at 400:8-16.

[37]   *See id.* at 1455:19-22 (Farman-Farma testifying that he was employed by Kozeny to work at Minaret); 1483:24-1484:9 (testifying about the conversation he had with Bourke regarding the dilution of shares). Oily Rock was the organization that was established to purchase vouchers on behalf of Bourke and his co-investors in Azerbaijan. *See id.* at 400:25-401:3. Bourke's co-conspirators agreed that a two-thirds interest in Oily Rock would be issued to Azeri officials in exchange for their assistance in encouraging the privatization of SOCAR. *See id.* at 431:12-434:25.

[38]   *Id.* at 1484:10-16.

9

Evans, another investor in the venture, also testified that Kozeny had told him and Bourke during a trip to Azerbaijan that they would not be receiving the "full value" of their investments because of a "split with local interests."[39]  It can be inferred from both of these conversations that Bourke was aware that "new partners" or "local interests" were receiving shares of the venture without consideration and in exchange for assistance in encouraging the Azeri Government to privatize SOCAR.

In addition, the Government introduced a tape recording of a May 1998 teleconference in which Bourke and Richard Friedman, another investor in Oily Rock, discussed with their attorneys how to limit any liability that may result from their participation on the boards of Kozeny's companies.[40]  During this call, Bourke indicated strongly that he knew Kozeny and others were engaged in bribing state officials.[41]

---

[39]     *Id.* at 2623:4-14.

[40]     *See* Government Exhibit ("GX") 4A-T-2.

[41]     *See id.* at 2 ("Bourke: I mean, they're talking about doing a deal in Iran . . . Maybe they . . . bribed them, . . . with ten million bucks . . . . I'm not saying that's what they're going to do, but suppose they do that . . . . What happens if . . . they bribe somebody in Kazakhstan and we're at dinner and . . . one of the guys [says] 'Well, you know, we paid some guy ten million bucks to get this now.' . . . I'm just saying to you in general . . . *do you think business is done at arm's length in this part of the world?*") (emphasis added).

10

Despite this knowledge, Bourke and Friedman proposed the formation

of companies affiliated with Oily Rock and Minaret that would shield them from

liability and limit their knowledge of the affairs of Kozeny's Oily Rock and

Minaret.[42]  Bourke joined the board of directors of Oily Rock US Advisors and

Minaret US Advisors on July 1, 1998.[43]  He made an additional investment in the

privatization scheme after his appointments to these positions.[44]

There is also substantial direct evidence of Bourke's knowledge.

Hans Bodmer, co-defendant and attorney to Kozeny during the period of the

scheme, testified that he had a conversation with Bourke in February 1998

regarding the bribery of Azeri officials.[45]  Bodmer testified that on February 5,

1998 during a trip to Azerbaijan, Bourke asked him, "what is the arrangement,

what are the Azeri interests."[46]  After obtaining Kozeny's approval to speak to

---

[42]     *See id.* (proposing the formation of "Oily Rock Partners" after discussion of possible bribery by Kozeny). *See* Tr. at 1582:24-1583:8.

[43]     *See* GX 217 (7/1/98 Letter Agreement between Oily Rock Group Ltd. and Bourke setting out the terms of his appointment to the board of Oily Rock U.S. Advisors); GX 601 (9/14/98 Minutes of an Oily Rock U.S. Advisors and Minaret U.S. Advisors meeting).

[44]     *See* Tr. 2056:2-11 (David Hempstead, one of Bourke's attorneys, testifying that Blueport International, a company set up by Bourke for the purpose of investing in the venture, had invested one million dollars in mid-July 1998).

[45]     *See id.* at 1065:7-1070:23.

[46]     *Id.* at 1065:15-16.

11

Bourke about the specifics of the "arrangement," Bodmer then met with Bourke the following day, February 6.[47]  He testified that he then told Bourke that two-thirds of the vouchers had been issued to the Azeri officials under credit facility agreements at no risk to them.[48]  He also identified the Azeri officials who received these vouchers as Barat Nuriyev, Nadir Nasibov, and their families.[49]

In addition to Hans Bodmer, the Government also called Thomas Farrell, co-defendant and one of Kozeny's employees.[50]  Farrell testified that some time after Bourke had invested in Oily Rock, Bourke requested that Farrell leave his office with him so that they might have a conversation.[51]  During that conversation, Bourke asked about the status of the privatization venture and whether President Aliyev or Barat Nuriyev had given any indications to Farrell about possible approval.[52]  Farrell testified that at one point in the conversation,

---

[47]  *See id.* at 1067:3-21.

[48]  *See id.* at 1068:23-1069:10

[49]  *See id.* at 1069:22-1070:3.  Nasibov was the Chairman of the State Committee for Property in Azerbaijan ("SPC").  *See id.* at 321:10-15; 444:18-19. Nuriyev was his deputy.  *See id.* at 427:17-18.

[50]  *See id.* at 354:7-15 (Farrell testifying regarding his duties on behalf of Kozeny).

[51]  *See id.* at 518:23-519:8.

[52]  *See id.* at 519:15-519:22.

Bourke had asked: "Has Viktor given them enough money?"[53]

Farrell testified that Bourke raised the subject with him a second time during a trip to celebrate the opening of the Minaret offices in Baku, Azerbaijan in April 1998.[54] Farrell testified that Bourke asked him about the prospects of privatization and whether Farrell had heard anything from the officials in charge, such as Nuriyev.[55] After Farrell gave Bourke a short status report, Bourke asked: "Well are – is Viktor giving enough to them?"[56]

Bourke contends that documentary evidence and obvious internal inconsistencies call into doubt Bodmer's and Farrell's testimony and therefore that these conversations could never have happened.[57] For instance, he notes that "[g]round handling records for Kozeny's private airplane show that [] Bourke and Kozeny did not arrive at the Baku airport until after 9 a.m. (Baku time) on February 6, 1998," demonstrating that the February 5th conversation with Bodmer could not have taken place.[58] Indeed, after being confronted with such evidence,

---

[53]     *Id.* at 520:1.

[54]     *See id.* at 535:23-536:16.

[55]     *See id.* at 536:18-23.

[56]     *Id.* at 536:24-26.

[57]     *See* Bourke Mem. at 31-33.

[58]     *Id.* at 31 (citing Defendant Exhibit A-15-F).

13

the Government stipulated that neither Bourke nor Kozeny was present in
Azerbaijan on February 5th.[59]

Bourke also notes that the conversation with Bodmer could not have
occurred during Bourke's April 1998 trip to Azerbaijan to celebrate the opening of
the Minaret offices because Bodmer specifically remembered the presence of
Evans on the trip.[60]  Because Evans did not travel to Azerbaijan in April, Bourke
argues that the Bodmer conversation could not have taken place during that trip
either.[61]

Bourke also disputes that one of the two conversations with Farrell
took place.[62]  He notes that Farrell had testified that he had met with Bourke after
Bourke's investment in the venture or several weeks prior to his second
conversation with Bourke, which he had placed in April 1998.[63]  However, Bourke
notes that he and Farrell had not been together since the February 1998 trip, and he

---

[59]  *See* Tr. at 2501:15-25.

[60]  *See* Bourke Mem. at 32 (citing Tr. at 1305:7-8).

[61]  *See id.*

[62]  *See id.* at 32-33.

[63]  *See id.* at 32; Tr. at 521:18-24 (Farrell testifying that the earlier
conversation with Bourke preceded the second conversation by "several weeks,
maybe a month, maybe less.").

14

had not taken a trip to Azerbaijan between February and April.[64]

Bourke contends that the only reasonable inference is that the talks never happened.[65] However, such a conclusion is justified only if the evidence is viewed in the light most *unfavorable* to the Government. Although Bodmer's and Farrell's testimony were impeached during trial, the jury was entitled to reject the testimony in whole, in part, or not at all.[66] The events took place more than ten years ago, and a reasonable juror may have discounted the dates, but nevertheless found the testimony of Bodmer and Farrell regarding the content of the conversations to be credible. Viewed in the light most *favorable* to the Government, the testimony shows that far from being ignorant of the corrupt arrangements, Bourke not only knew about them but supported them. Because I find that the Government presented sufficient evidence to demonstrate beyond a

---

[64]    *See* Bourke Mem. at 32-33 (citing GX 1100, a chart that shows that Bourke was in Azerbaijan in February and then again in April 1998).

[65]    *See id.* at 32-33.

[66]    Indeed, the jury was specifically instructed that they could reject any testimony that they did not find credible. *See* Tr. at 3350:9-16 (THE COURT: "If you find that a witness has testified falsely as to any material fact, you have the right to reject the testimony of that witness in its entirety. On the other hand, even if you find that a witness has testified falsely about one matter, you may reject as false that portion of his testimony and accept as true any other portion of his testimony that commends itself to your belief or that you may find corroborated by other evidence in the case.").

15

reasonable doubt that Bourke possessed actual knowledge of the object of the conspiracy, Bourke's Rule 29 motion is denied.[67]

Bourke also moves pursuant to Rule 33 for a new trial, arguing that this Court should evaluate the testimony of Bodmer and Farrell and that there is a "real concern that an innocent person may have been convicted."[68]  Quoting the Second Circuit in *United States v. Sanchez*, he notes that "'[w]here testimony is patently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation.'"[69]

However, the Second Circuit also noted in *Sanchez* that "[e]ven in a case where perjury clearly has been identified, [] we have indicated our reluctance to approve the granting of a new trial unless we can say that the jury probably would have acquitted in the absence of the false testimony."[70]  It ruled that "[i]t is only in the rare instance where it can be shown that the prosecution knowingly

---

[67]    Furthermore, as discussed below in Part IV.C.1.a, a reasonable juror could find beyond a reasonable doubt and based on the evidence presented at trial, that Bourke was aware of the high probability that bribes were being paid and that he took steps to avoid confirming that fact.

[68]    Bourke Mem. at 33 (quotations omitted).

[69]    *Id.* at 30 (quoting *Sanchez*, 969 F.2d at 1413).

[70]    *Sanchez*, 969 F.2d at 1413-14 (citing *United States v. Stofsky*, 527 F.2d 237, 245-46 (2d Cir. 1975)).

used false testimony that we would apply a less stringent test and permit the granting of new trial where the jury 'might' have acquitted absent the perjury."[71]

There is no evidence that Bodmer committed perjury on the stand. Bodmer testified in accordance with what was on his attorney time records and reasoned that the only other trip that he had taken with Bourke to Azerbaijan besides the trip for the opening of the Minaret offices was in February 1998.[72] If he testified falsely, it appears to have been unintentional. There is also no evidence that the Government was aware of such discrepancy. Even if I determined that Bodmer had committed perjury by testifying falsely about the dates, I cannot say that the other evidence in the record, including Farrell's testimony that he spoke to Bourke about the corrupt arrangements in April 1998 – which was not impeached – was insufficient to demonstrate beyond a reasonable doubt that Bourke possessed the requisite knowledge of the scheme. I therefore also deny Bourke's Rule 33 motion.

### 2.    Count Three – False Statements Charge

Bourke argues again that "[t]he jury could not have found beyond a

---

[71]    *Id.* at 1414 (citing *Stofsky*, 527 F.2d at 246).

[72]    *See* Tr. at 1073:1-25 (Bodmer testifying that he could not remember the specific date of the conversation except that it took place in Spring 1998, and that he had been together with Bourke one time in addition to the opening of the Minaret offices).

17

reasonable doubt that [] Bourke's statements, viewed in context and as a whole, were materially false" and therefore that he should be acquitted of the false statements charge.[73]  But none of Bourke's arguments convince me that my decision denying his previous Rule 29 motion on the false statements charge should be reconsidered.[74]

As noted in my July Opinion and Order, when the evidence is viewed as a whole, a reasonable jury could find that a number of Bourke's statements are flatly contradicted by the testimony of Farrell and Bodmer.[75]  For instance, Agent George Choundas, the FBI special agent who interviewed Bourke in April and May 2002,[76] testified that Bourke was asked whether he had any conversations with Bodmer or Kozeny regarding a scheme to influence Azeri officials.[77]  Bourke had answered: "No, because I didn't think there were any."[78]  However, as noted, Bodmer testified that Bourke had approached him in February 1998 about an

---

[73]     Bourke Mem. at 50.

[74]     *See Kozeny*, 2009 WL 1940897, at *6.

[75]     *See id.*

[76]     *See* Tr. at 2449:5-10 (Choundas testifying that he was a special agent with the FBI from 1999 to 2004); *id.* at 2453:20-21 (testifying that the interviews of Bourke took place in April and May 2002).

[77]     *See id.* at 2465:25-2466:2.

[78]     *Id.* at 2466:5-6.

"arrangement" with the Azeri officials, and that Bodmer had then explained to Bourke how the Azeri officials were to receive a two-thirds share of the vouchers for essentially no consideration.[79] While Bodmer's testimony that the conversation took place on February 5, 1998 was called into doubt, a reasonable juror could conclude that the conversation nevertheless took place some time close to that date.

Agent Choundas also testified that Bourke was specifically asked whether – by April 1998 and the opening of the Minaret offices – he had reason to suspect that Kozeny was paying bribes to Azeri officials.[80] Bourke had answered no.[81] Bourke was subsequently asked whether by April 1998 he had been given any indication that "anything untoward relating to the investment was going on."[82] Again, he responded no.[83] However, such statement is belied by the testimony of Farrell and Bodmer that they both had conversations with Bourke by April 1998 about payments to the Azeri officials.[84]

---

[79]     See id. at 1065:7-1070:13.

[80]     See id. at 2458:11-16.

[81]     See id. at 2458:17-18.

[82]     Id. at 2458:19-22.

[83]     See id. at 2458:23-24.

[84]     See id. at 1065:7-1070:13 (Bodmer's testimony); see id. at 519:13-520:7; 536:14-537:1 (Farrell's testimony).

19

Finally, Bourke was asked, "Were you aware at any point or did you have any reason to suspect at any point that Viktor had given anything to Azeri officials, whether it was President Aliyev or the chairman or deputy chairman of the SPC, was there ever a point in time where you saw anything that might have caused you to suspect that anything like that was going on?"[85]  Choundas testified that Bourke had answered, "I'd say no to that. I was unaware. I'm still unaware of any transfers of anything. I exclude from that if Viktor bought dinners for people, but in terms of cash or stock or anything of that sort, completely unaware of it."[86] Again, these statements are directly contradictory to the testimony of Bodmer and Farrell. The statements also conflict with Farman-Farma's testimony that Bourke was aware that his shares in Oily Rock were being diluted so that "new partners" could have an interest in the venture.[87]  The statements also diverge from Evans' testimony that Kozeny had informed Bourke and Evans that the venture would be shared with "local interests."[88]

Bourke attempts to minimize these responses, contending that the

---

[85]     *Id.* at 2458:25-2459:6.

[86]     *Id.* at 2459:18-22.

[87]     *Id.* at 1483:24-1484:16.

[88]     *Id.* at 2623:4-14.

testimony of both Bodmer and Farrell was heavily impeached and therefore that

the February and April conversations did not occur.[89]  He also notes that the

opening of the Minaret offices occurred on April 22, 1998 and therefore the

discussion he had with Bodmer – if it took place in April instead of February – and

the second conversation with Farrell in April could have taken place *after* the

opening of the Minaret offices.[90]  He argues that his response that he was unaware

of "anything untoward" *by* April 1998 and the opening of the Minaret offices was

therefore true.

    However, as discussed, a reasonable juror need not have rejected the

testimony of Bodmer and Farrell completely.  She could have concluded that the

Bodmer conversation and the first Farrell conversation occurred sometime during

the February 1998 trip to Azerbaijan.  Placing the Bodmer and Farrell

conversations after the Minaret opening also does not explain Bourke's response

that – even up until the time of his interview with Agent Choundas – he had no

reason to suspect Kozeny had given anything to the officials.  And even if a

reasonable juror decided that the Bodmer conversation and the first of the two

---

[89]  *See* Reply Memorandum of Law in Further Support of Defendant
Frederic Bourke, Jr.'s Post-Trial Motion for Entry of a Judgment of Acquittal
Pursuant to Fed. R. Crim. P. 29 or for a New Trial Pursuant to Fed. R. Crim. P. 33
("Bourke Reply") at 32.

[90]  *See id.* at 32-33.

Farrell conversations could not have occurred, the second of the two Farrell

conversations was not impeached or otherwise discredited.

A reasonable juror could also have decided that the April 1998

conversations occurred prior to or on the day of the opening of the Minaret offices.

"Whether a statement [is] literally true is generally an issue for the jury to

decide."[91] And while this Court "may make this determination in limited

circumstances where 'there can be *no doubt* that [the defendant's] answers were

literally true under any conceivable interpretation of the questions,'"[92] I cannot say

that there is no doubt in this case.

Bourke's argument that he had not made a false statement because he

"expressly stated his belief that Kozeny was 'paying off' Azeri officials" as part of

the options fraud scheme is of no moment.[93] A reasonable jury could find, based

---

[91]     *United States v. Carey*, 152 F. Supp. 2d 415, 423 (S.D.N.Y. 2001)
(citing *United States v. Lighte*, 782 F.2d 367, 372, 374 (2d Cir. 1986)).  Indeed, the
jury was specifically instructed, according to Bourke's request, that "[i]f the FBI's
question was ambiguous so that it reasonably could be interpreted in several ways,
then the government must prove that the defendant's answer was false under any
reasonable interpretation of the question."  Tr. at 3382:3-6.

[92]     *Carey*, 152 F. Supp. 2d at 423 (quoting *Lighte*, 782 F.2d at 374)
(emphasis added).

[93]     Bourke Mem. at 50-51.  At some point, Nuriyev and Nasibov began
imposing the requirement that foreign investors would need to purchase options in
addition to vouchers. *See* Tr. at 411:21-23; 427:1-15.  Kozeny masterminded a
plan – later called the "options fraud scheme" – in which he would defraud Oily

on the evidence offered at trial, that Bourke had no knowledge of the options fraud

scheme until approximately October 1998.[94]  Therefore, Bourke's statement that

Kozeny was bribing officials in furtherance of Kozeny's options fraud scheme

rather than the privatization venture would not explain Bourke's denial of

knowledge of the bribery that had already occurred by April 1998.  Bourke's Rule

29 motion for entry of a judgment of acquittal as to Count Three is therefore

denied.

## B.    Alleged Errors in the Court's In Limine Rulings

Bourke also challenges the Court's rulings on a number of the parties'

motions *in limine.*  I will discuss each of his arguments in turn.

### 1.    Bruce Dresner's Testimony

Bourke contends that the Court improperly precluded Bruce Dresner,

the Vice President for Investments at Columbia University ("Columbia"), from

testifying about Columbia's investment in the privatization venture through Omega

---

Rock's institutional investors by selling them options directly from Oily Rock at
inflated prices in contravention of the co-investment agreements that governed the
terms of the investments. *See id.* at 549:14-551:16.

[94]      *See* Tr. at 1177:2-1178:6 (Bodmer testifying that he met with Bourke
in October 1998, and that Bourke had informed him that he had discovered
Kozeny's options fraud scheme); *id.* at 738:13-740:22 (Farrell testifying that
Bourke had met with Aliyev in October 1998 to report that Farrell and Kozeny
were "crooks" and then had met with Farrell and Kozeny and had accused them of
cheating investors).

Advisors ("Omega"), one of the hedge funds that invested in Oily Rock.[95]  Bourke

claims that the admission of Dresner's testimony was important for two reasons.

*First*, he contends that Dresner would have testified about the due diligence

conducted by Columbia before it invested.[96]  Thus, Bourke would have been able

to show that his own limited investigation into the investment was

"unexceptionable."[97]  *Second*, Bourke states that "Dresner's testimony [] would

have been relevant to rebut the Government's argument that [] Bourke's statements

on the tape-recorded portion of the May 1998 conference call are evidence of

guilty knowledge" because Dresner and members of Columbia's Finance and

Steering Committees expressed the same concerns to Clayton Lewis, Bourke's co-

defendant and an Omega employee who was marketing the venture to clients.[98]

      I precluded Dresner's testimony on relevance grounds, noting that

Dresner had no contact with Bourke or Kozeny and had relied entirely on the

representations of Lewis and Omega, and that Columbia had invested in Omega,

rather than in Oily Rock directly.[99]  I also ruled that Dresner's investment

---

[95]    *See* Bourke Mem. at 33.

[96]    *See id.* at 35.

[97]    *Id.*

[98]    *Id.* at 36.

[99]    *See* Tr. at 2696:10-14; 2701:2-4.

memorandum could not be introduced as evidence on hearsay grounds, concluding that it did not fall under the business records exception of Federal Rule of Evidence 803(6).[100]  After reviewing Bourke's arguments, I see no reason to revisit my rulings.

### a.   Relevance to Show Bourke's Limited Due Diligence Was Unexceptionable

In the first place, Dresner's due diligence or lack thereof is simply irrelevant to whether Bourke consciously avoided learning about the bribery. Dresner had no contact with Bourke, nor did he have access to Kozeny.  Dresner also never visited Azerbaijan.  What Dresner and Columbia learned about the investment was entirely through Lewis and Omega.

Bourke argues that the Government introduced the testimony of Carrie Wheeler, an employee of Texas Pacific Group ("TPG") – which was also approached by Kozeny to invest in the privatization venture – and David Rossman, an attorney for TPG, in order to contrast the due diligence they performed to that of Bourke.[101]  Bourke asserts that allowing Wheeler and Rossman to testify but precluding Dresner "unilaterally disarmed [him]."[102]

---

[100]   *See id.* at 2697:1-19; 2701:2-4.

[101]   *See* Bourke Reply at 17; Bourke Mem. at 33.

[102]   Bourke Mem. at 33.

However, Wheeler's and Rossman's testimony is easily distinguishable from Dresner's. Wheeler, along with Bourke and other investors, took an introductory trip to Azerbaijan in January 1998.[103] Thus, Wheeler was exposed to the same sources as Bourke and would have been privy to the same information regarding SOCAR as Bourke. Kozeny had also invited TPG to invest directly in Oily Rock.[104] By contrast, Dresner and Columbia had been approached by Lewis to invest in Omega. Any information they received regarding the opportunity would have been through Lewis and Omega. Therefore, whatever Dresner and Columbia learned or failed to learn has no bearing on what Bourke knew.[105]

---

[103]    *See* Tr. at 1747:21-1748:23 (Wheeler testifying that she visited Azerbaijan in January 1998 with Kozeny, Bourke, and other potential investors in order to conduct due diligence on the SOCAR opportunity for TPG).

[104]    *See id.* at 1748:3-8 (Wheeler testifying that David Bonderman, her boss at TPG, had been approached by Kozeny to invest in SOCAR).

[105]    *See United States v. Kaplan*, 490 F.3d 110, 121 (2d Cir. 2007) ("Evidence of others' knowledge would have been highly relevant had it been supplemented by evidence supporting the conclusion that such knowledge was communicated to [the defendant], or that [the defendant] had been exposed to the same sources from which these others derived their knowledge of the fraud. In the absence of such evidence, the relevance of others' knowledge was at best minimal in proving [the defendant's] knowledge."). Also, to the extent that Bourke wished to show that other investors engaged in limited due diligence, there was ample testimony at trial from other investors who admitted to not conducting the same amount of diligence as TPG. *See, e.g.*, Tr. at 1632:9-1633:23 (Senator George Mitchell testifying that his due diligence consisted of reading some "critical"

### b.      Relevance to Show May 1998 Statements Were Not Evidence of Guilt

For the same reasons, Dresner's questions regarding possible FCPA liability during a due diligence session has no relevance to Bourke's May 1998 discussion with Friedman and their lawyers in which Bourke expressed concern that they might discover that Kozeny and his cohorts were engaging in corrupt payments and agreed that establishing companies to limit liability would be advisable.  It appears that Bourke wished to introduce Dresner's testimony for the purpose of casting doubt on the charges against him by showing that Dresner and Columbia possessed the same concerns about FCPA liability, but nevertheless escaped indictment.  Indeed, he contends that "[e]vidence that Dresner and members of Columbia's Finance and Steering Committees expressed identical concerns about the same investment tends to make the fact of [] Bourke's alleged guilty knowledge less probable than it would otherwise be."[106]  However, the drawing of such inferences is improper – that Bourke was ultimately charged while Dresner was not is irrelevant.  And even if there was a slight probative value to Dresner's testimony, the possibility that the jury might draw such an improper

---

newspaper articles about Kozeny and talking to Bourke).  Thus, even if Dresner's testimony was relevant, testimony about his due diligence would have been cumulative.

[106]      Bourke Mem. at 36.

27

inference renders such evidence more prejudicial than probative. Bourke's motion for a new trial on this ground is therefore denied.[107]

### 2.    Government Exhibit 181: Schmid Memorandum

At trial, I allowed the Government to introduce a portion of a draft memorandum – written for Bodmer by Rolf Schmid, Bodmer's associate – that recounted Bodmer's February 1998 conversation with Bourke about the corrupt arrangements. Bodmer's testimony regarding that conversation had been called into doubt and challenged by the defense, and the Government sought to rehabilitate Bodmer by eliciting testimony from Schmid that Bodmer had told Schmid about his conversation with Bourke. Anticipating that Schmid would also be heavily impeached by the defense, the Government asked the Court to allow the admission of that portion of the memorandum for the sole purpose of allowing the Government to present a prior consistent statement of Schmid under Rule 801(d)(1)(b).[108]

---

[107]    Bourke does not argue that my ruling with respect to Dresner's investment memorandum was in error. I find no reason to reconsider that decision either.

[108]    *See* Tr. at 1344:2-1345:1 (Government requesting that Schmid be allowed to testify that Bodmer had told him about the conversation with Bourke shortly after Bodmer returned from Azerbaijan as a prior consistent statement and further requesting that if Schmid is impeached, the Government be allowed to introduce the portion of Schmid's draft memorandum memorializing this conversation); 1348:2-3 (Court granting the Government's request).

Bourke did not object to the introduction of such evidence, but requested that the Court allow the introduction of other portions of the memorandum in which Schmid had noted that the credit facility extended by Kozeny to Azeri officials was an arm's length transaction and that Bodmer had no knowledge of the corrupt payments to Azeris.[109] He argued that admission of such evidence was warranted pursuant to the Rule of Completeness and as prior inconsistent statements of Bodmer.[110]

Noting that the memorandum was written by Schmid rather than Bodmer, I denied the request, but added that if Bourke could lay a foundation that the statements in the Schmid memorandum were affirmed by Bodmer, I would reconsider my ruling.[111] Defense counsel then conducted a voir dire on the exhibit, but Schmid responded that he had not obtained any information from Bodmer when preparing the memorandum.[112]

Schmid's response should have shut the door on further arguments

---

[109]   *See id.* at 1345:13-1346:2.

[110]   *See id.* at 1345:19-21 (contending that Rule 106 – the Rule of Completeness – mandates that other portions be admitted for the purpose of giving context); 1346:18-19 (arguing that the contents of the memorandum are prior inconsistent statements of Bodmer).

[111]   *See id.* at 1348:2-8.

[112]   *See id.* at 1382:15-21.

29

over the redacted portions of the memorandum.  Nevertheless, Bourke now moves

for a new trial, arguing that "[t]he Court's decision not to admit this critical piece

of evidence in its entirety robbed the jury of the context it needed to evaluate both

Bodmer's testimony and the admitted portions of the memo," thereby likely

affecting the outcome of the trial.[113]  Bourke makes three arguments in support of

his position.  *First*, he asserts again that the memorandum should have been

admitted in its entirety under the Rule of Completeness to give the jury context for

the portion of the memorandum the Government introduced.[114]  *Second*, he

contends that there was substantial evidence that the redacted portions of the

memorandum were "memorializations of what Bodmer told Schmid about his

understanding of the Azeri investment venture" and that the alleged "prior

inconsistent statements were textbook impeachment material" that should have

been admitted.[115]  *Finally*, he argues that admission of the excluded portions of the

memorandum were necessary so that the jury could assess the credibility of the

portions the Court admitted.[116]  Bourke's request is denied for substantially the

---

[113]     Bourke Mem. at 42.

[114]     *See id.* at 37.

[115]     *Id.* at 40.

[116]     *See id.* at 42.

30

same reasons I denied his request at trial.

### a.    Prior Inconsistent Statements of Bodmer

Bourke's contention that the redacted portions of the Schmid memorandum should have been admitted as prior inconsistent statements of Bodmer fails. *First*, there was no evidence that Bodmer affirmed the statements in the memorandum. In addition to responding that he had not obtained information from Bodmer in preparing the memorandum,[117] Schmid further testified that his statements about Bodmer's conversation with Bourke were based on his "own recollections" and on "the files that were available."[118] He testified that he did not recall receiving comments from Bodmer and that the memorandum did not reflect what "other people's recollection [was]."[119] *Second*, even if the statements could be attributable to Bodmer, Federal Rule of Evidence 801(d)(1)(A) provides that inconsistent statements are not hearsay if "the statement [] was given under oath

---

[117]    *See* Tr. at 1382:15-21.

[118]    *Id.* at 1387:10-23.

[119]    *Id.* at 1400:3-6, 18-24; 1403:12-18. Bourke argues that he need only show that the statements are attributable to Bodmer by the preponderance of the evidence, but the only evidence he puts forth is the conclusory argument that "the statements in the memo had to come from somewhere, and the logical source was Hans Bodmer." Bourke Reply at 21. Not only is such argument completely unsupported, but it is severely undercut by Schmid's repeated denials that the statements were attributable to anyone else.

31

subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition." None of the statements in the Schmid memorandum were made under oath. These portions are therefore inadmissible hearsay.

### b.      Rule of Completeness

The Rule of Completeness provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at the time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."[120] Bourke quotes the Second Circuit correctly when he argues that an "'omitted portion of [the] statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion.'"[121] But the Second Circuit has also held that "'the completeness doctrine does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages.'"[122]

---

[120]      Fed. R. Evid. 106.

[121]      Bourke Mem. at 38 (quoting *United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007) (quotations omitted)).

[122]      *Johnson*, 507 F.3d at 796 (quoting *United States v. Jackson*, 180 F.3d 55, 73 (2d Cir. 1999)).

Here, the redacted portions had no relevance to the admitted passages. Indeed, the memorandum contained Schmid's draft answers to a series of interrogatories on a wide range of subjects posed by attorneys in a related litigation in London.[123]  The portion that was admitted was introduced only as a prior consistent statement of Schmid.  There is no indication that any portion of the memorandum was based on anything but his own understanding.  It therefore has no relevance to Bodmer's knowledge of the corrupt arrangements or to what Bodmer discussed with Bourke.

### c.    Impeachment of Schmid

Bourke next argues that the redacted portions were important because they would have been used by the jury to assess the credibility of Schmid with respect to the portion that was admitted.[124]  He notes that the answers were given "to minimize the firm's culpability" in the London litigation and "to shift blame to others, including [] Bourke."[125]

---

[123]    *See* Tr. at 1379:19-1380:20.  The London litigation was brought by Omega and other institutional investors against Kozeny and Oily Rock alleging that they were defrauded when Kozeny sold them options at inflated prices in violation of their co-investment agreement. *See id.* at 1378:17-1379:11.  Bourke was not a party to that action.

[124]    *See* Bourke Mem. at 42.

[125]    *Id.*

Bourke not only failed to make this argument prior to my ruling at trial, but the argument makes no sense. If anything, Schmid may have had a reason to lie about whether the transactions were entered at arms length and any knowledge of the corrupt payments by Bodmer. However, there certainly would have been no reason to fabricate conversations that Bodmer had with Bourke regarding the credit facility agreements. Indeed, the rest of Schmid's answer includes a summary of Bodmer's conversation with Eric Vincent, an employee of Omega Advisors, regarding whether any of the agreements were in violation of the FCPA.[126] If Schmid had wanted to "minimize the firm's culpability," he would have excluded any such information. It was therefore proper for this Court to redact the portions of the Schmid memorandum that the defense requested. Bourke's motion for a new trial on this ground is therefore denied.

### 3. Cross-Examination of Thomas Farrell

At a May 21, 2009 conference, the Court denied Bourke's request to cross-examine Thomas Farrell about certain matters, holding that such cross-examination would be more prejudicial than probative. Bourke has given me no reason to reconsider my ruling. His motion for a new trial on this ground is

---

[126] *See* GX 181A ("Hans Bodmer discussed with Eric Vincent the various agreements which were to be concluded with Oily Rock and Minaret . . . . During his discussion he asked Eric Vincent whether the involvement of the Azeri Interests [] was in compliance with the U.S. Foreign Corrupt Practices Act . . . .").

therefore denied.

### C.    Alleged Errors in the Court's Jury Charge

Bourke argues next that the Court's jury instructions were erroneous in a number of respects.  I will discuss each of his challenges in turn.

### 1.    Conscious Avoidance

Bourke argues that the Court erroneously charged the jury that it could find him guilty of the conspiracy offense on a theory of conscious avoidance despite the fact that "(1) the Government expressly disclaimed reliance on such a theory at trial; and (2) the Government's evidence, at best, could establish only negligence, which under controlling Second Circuit precedent cannot support criminal liability."[127]  He contends that because the Government's evidence of actual knowledge was thin, there was a "strong possibility" that the conscious avoidance charge misled the jury into improperly believing that it could convict him on the basis that he had "'not tried hard enough to learn the truth.'"[128]

"The conscious avoidance doctrine provides that a defendant's knowledge of a fact required to prove the defendant's guilt may be found when the jury is persuaded that the defendant consciously avoided learning that fact while

---

[127]    Bourke Mem. at 7.

[128]    *Id.* (quoting *United States v. Ferrarini*, 219 F.3d 145, 157 (2d Cir. 2001)).

35

aware of a high probability of its existence."[129]  With respect to conspiracy, the

Second Circuit has held that conscious avoidance may satisfy the knowledge

component of the intent to participate in the conspiracy, even though there must be

further proof that the defendant joined the conspiracy with the intent to further its

criminal purpose.[130]

       A conscious avoidance charge is proper "'(i) when a defendant asserts

the lack of some specific aspect of knowledge required for conviction and (ii) the

appropriate factual predicate for the charge exists.'"[131]  A factual predicate exists

when "the evidence is such that a rational juror may reach the conclusion beyond a

reasonable doubt that the defendant was aware of a high probability of the fact in

dispute and consciously avoided confirming that fact."[132]

---

[129]    *United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003) (quotation omitted).

[130]    *See id.* at 479.  In addition, the FCPA explicitly permits a finding of knowledge on a conscious avoidance theory.  It provides that "[w]hen knowledge of the existence of a particular circumstance is required for an offense, such knowledge is established if a person is aware of a high probability of the existence of such circumstance, unless the person actually believes that such circumstance does not exist."  15 U.S.C. § 78dd-2(h)(3)(B).  Because the defendant must be found to possess the same intent as that required for the substantive offense, the conscious avoidance instruction was particularly appropriate in this case.

[131]    *United States v. Kaplan*, 490 F.3d 110, 127 (2d Cir. 2007) (quoting *United States v. Quattrone*, 441 F.3d 153, 181 (2d Cir. 2006)).

[132]    *Id.*

### a.    A Factual Predicate Exists for a Conscious Avoidance Charge

There is no dispute with respect to the first requirement – Bourke's key defense was that he never knew of any corrupt arrangements.[133] I also find that the appropriate factual predicate exists for such a charge. There was ample evidence that Bourke was aware of a high probability that the payments were illegal and deliberately avoided confirming this fact. *First*, there was testimony at trial from a number of witnesses that Bourke knew that corruption was rampant in Azerbaijan. For instance, Farman-Farma testified that he and Bourke were aware that "Azerbaijan . . . was rated as one of the most corrupt countries in the world."[134] One of Bourke's attorneys, Arnold Levine, also testified that he had once compared Azerbaijan to the "wild west" in a conversation with Bourke.[135]

*Second*, there was also testimony that Bourke was aware of Kozeny's exploits and misdeeds in Czechoslovakia. David Hempstead, another of Bourke's

---

[133]    *See* Tr. at 123:9-14 (defense counsel arguing during opening statements that "[t]here was no way Kozeny was going to let anybody tell [] Bourke about any payments he was making to the Azeris").

[134]    *Id.* at 1496:11-19.

[135]    *Id.* at 1571:21-24. Although Levine later attempts to explain that he would also call Russia the "wild west" because of the lawlessness, *see id.* at 1578:24-1580:22, a reasonable juror could have inferred – based on the testimony as a whole – that Levine also alerted Bourke to corruption in Azerbaijan.

37

attorneys, testified that Bourke was familiar with Kozeny's past and had told

Hempstead on one occasion that Kozeny was replicating in Azerbaijan the same

scheme that he had staged during Czechoslovakia's privatization period, which

consisted of amassing vouchers in order to later control companies.[136]  Senator

Mitchell also testified that he had approached Bourke to express his concerns after

reading a number of negative news articles about Kozeny's Czechoslovakia

ventures and that Bourke had already been "aware" of them.[137]

Perhaps the strongest evidence that Bourke was aware of the high

probability that corrupt payments were being made to Azeri officials is a May 18,

1989 tape recording of a phone conference among Bourke, Friedman, and their

attorneys during which they discuss whether Bourke and Friedman will join the

board of Oily Rock.[138]  During this conversation, Bourke expressed his concern

that Kozeny and his employees were paying bribes and violating the FCPA: "I

mean, they're talking about doing a deal in Iran . . . . Maybe they . . . bribed them, .

. . with . . . ten million bucks.  I, I mean, I'm not saying that's what they're going to

---

[136]     *See id.* at 1924:9-1925:6.

[137]     *Id.* at 1632:9-22.

[138]     *See* GX 4A-T-2.

38

do, but suppose they do that."[139]  Later in the conversation, Bourke says:

> I don't know how you conduct business in Kazakhstan or
> Georgia or Iran, or Azerbaijan, and if they're bribing
> officials and that comes out . . . Let's say . . . one of the
> guys at Minaret says to you, Dick, you know, we know
> we're going to get this deal.  We've taken care of this
> minister of finance, or this minister of this or that.  What
> are you going to do with that information?[140]

Still later in the conversation, Bourke again ponders:

> What happens if they break a law in . . . Kazakhstan, or
> they bribe somebody in Kazakhstan and we're at dinner and
> . . . one of the guys says, 'Well, you know, we paid some
> guy ten million bucks to get this now.'  I don't know, you
> know, if somebody says that to you, I'm not part of it . . . I
> didn't endorse it.  But let's say [] they tell you that.  You
> got knowledge of it.  What do you do with that? . . . I'm
> just saying to you in general . . . *do you think business is
> done at arm's length in this part of the world.*[141]

These comments certainly suggest that Bourke suspected bribes were being paid to

encourage the privatization of SOCAR.[142]  Furthermore, statements such as "What

---

[139]    *Id.* at 2.

[140]    *Id.* at 3.

[141]    *Id.* (emphasis added).

[142]    It may also be inferred from this evidence that Bourke actually knew
about the bribes. *See Svoboda*, 347 F.3d at 480 ("Of course, 'the same evidence
that will raise an inference that the defendant had actual knowledge of the illegal
conduct ordinarily will also raise the inference that the defendant was subjectively
aware of a high probability of the existence of illegal conduct.'").

are you going to do with that information?" and "You got knowledge of it. What do you do with that?" indicate that he feared what he might discover.

There is also a factual predicate for the conclusion that Bourke took steps to avoid learning that the bribes were illegal. At the end of the recording, Bourke and Friedman decided that instead of joining the Oily Rock board directly, they would join the boards of newly-established but separate companies that were affiliated with Minaret and Oily Rock.[143] According to their conversation, the purpose of forming these companies was to enable them to participate in the venture without having direct access to knowledge about Oily Rock's transactions and without the possibility of being held civilly or criminally accountable should any of their suspicions about Kozeny turn out to be true.[144] Thus, if Bourke did not actually know, this evidence is at least sufficient for a reasonable juror to conclude beyond a reasonable doubt that he knew of the high probability that bribes were being paid *and* that he took steps to ensure that he did not acquire knowledge of

---

[143]   *See* GX 4A-T-2 at 7 (Friedman: "So [] we have Oily Rocks U.S. Corp[.], a blank corporation, which we are directors . . . it has a contract with Oily Rocks Group to provide advice on strategic matters . . . .").

[144]   *See id.* at 8 (William Benjamin, Friedman's counsel: "From [] a legal point of view, I think you've successfully distanced yourself from [] the existing company . . . [you will not be at risk civilly or criminally so long as] you're not directly participating in it in some way . . . .").

that fact.[145]  A factual predicate therefore existed for this instruction.

### b.    The Government's "Express Disclaimer" that It Was Not Relying on Conscious Avoidance Theory

Bourke makes much of the Government's rebuttal summation in which it argued that Bourke did not look the other way, but "knew everything he needed to know to become a member of the conspiracy."[146]  He argues that the charge was improper given that the Government had decided only to advance an actual knowledge theory.  However, Bourke's citation only to the Government's rebuttal summation is misleading and ignores the fact that this argument was made in response to Bourke's suggestion that he was merely negligent.  The Government made clear in its introductory summation that it was also contending alternatively that Bourke was deliberately avoiding knowledge of the corrupt payments:

> So the question you have to decide is whether the defendant knew of the conspiracy.  Did he join it?  And did he lie when he told the FBI he knew nothing about it?  What facts did the defendant know?  *And what additional facts must he*

---

[145]    This case is therefore distinguishable from *United States v. Ferrarini*.  In *Ferrarini*, the Second Circuit cautioned that conscious avoidance cannot be found whenever there is evidence of actual knowledge because there would be a danger that a defendant would be convicted based only on "equivocal" evidence of actual knowledge and in the absence of evidence showing that the defendant deliberately avoided learning the truth.  *Ferrarini*, 219 F.3d at 157.  By contrast, there is evidence here demonstrating that Bourke feared what he might learn and made efforts to distance himself from such knowledge.

[146]    Bourke Mem. at 9 (quoting Tr. at 3279:19-21).

41

> *have known unless he was willfully avoiding learning them*
> *by essentially sticking his head in the sand?*[147]

Indeed, the Second Circuit has specifically approved the giving of a conscious

avoidance charge where both theories are argued, ruling that a conscious avoidance

charge is "'not inappropriate merely because the government has primarily

attempted to prove that the defendant had actual knowledge, while urging in the

alternative that if the defendant lacked such knowledge it was only because he had

studiously sought to avoid knowing what was plain.'"[148]

### c.    A Conviction Based on Negligence

Bourke's second argument – that the Government merely presented

evidence of Bourke's negligence – also fails.  In attempting to make his point,

Bourke quotes to a passage from Judge Richard Posner's opinion in *United States*

*v. Giovanetti* on conscious avoidance:

> "The most powerful criticism of the ostrich instruction is,
> precisely, that its tendency is to allow the jury to convict
> upon a finding of negligence for crimes that require intent
> . . . . The criticism can be deflected by thinking carefully
> about just what it is that real ostriches do . . . . They do not
> just fail to follow through on their suspicions of bad things.
> They are not merely careless birds.  They bury their heads
> in the sand so that they will not see or hear bad things.

---

[147]    Tr. at 3034:18-23 (emphasis added).

[148]    *Kaplan*, 490 F.3d at 128 n.7 (quoting *United States v. Hopkins*, 53
F.3d 533, 542 (2d Cir. 1995)).

> They deliberately avoid acquiring unpleasant knowledge.
> *The ostrich instruction is designed for cases in which there
> is evidence that the defendant, knowing or strongly
> suspecting that he is involved in shady dealings, takes steps
> to make sure that he does not acquire full or exact
> knowledge of the nature and extent of those dealings.*"[149]

But Judge Posner's description is wholly consistent with this case. As discussed,

there is plenty of evidence that Bourke – rather than merely failing to conduct due

diligence – had serious concerns that Kozeny was engaging in questionable

practices but nevertheless took steps to avoid learning about those practices by

declining to join the board of Oily Rock. His remarks on the tape evidencing his

concern that he would discover Kozeny's engagement in corrupt practices and the

subsequent formation of companies affiliated with Oily Rock in which he could

participate without being held accountable for Kozeny's actions demonstrate that

he was not merely negligent, but was deliberately attempting to shield himself

from actual knowledge.

Bourke also makes much of what he calls the "Government's 'due

diligence' evidence."[150] For instance, he argues that the Government improperly

distinguished the due diligence conducted by Wheeler and Rossman from the due

---

[149]    Bourke Mem. at 12 (quoting *United States v. Giovanetti*, 919 F.2d
1223, 1228 (7th Cir. 1990)) (emphasis added).

[150]    *Id.*

43

diligence, or lack thereof, that he and his attorneys performed.[151]  But such

distinctions were highly relevant to the jury's determination of whether Bourke

consciously avoided knowing about the details of the venture.  The Government

was entitled to show that others – who were exposed to the same sources as Bourke

– had high suspicions regarding the legitimacy of the venture which they were able

to later confirm while Bourke willfully shielded himself from learning all the facts.

And there is no reason to believe that the jury improperly returned a

guilty verdict on the basis of Bourke's negligence.  The jury was specifically

instructed that Bourke could not be convicted if it found him to be negligent.  The

jury was instructed – with respect to conscious avoidance – that Bourke's

> knowledge may be established when a person is aware of a high probability of its existence, and consciously and intentionally avoided confirming that fact. Knowledge may be proven in this manner if, but only if, the person suspects the fact, realized its high probability, but refrained from obtaining the final confirmation because he wanted to be able to deny knowledge. *On the other hand, knowledge is not established in this manner if the person merely failed to learn the fact through negligence or if the person actually believed that the transaction was legal.*[152]

Bourke's motion for a new trial on this ground is therefore denied.

---

[151]    *See id.* at 13-14.

[152]    Tr. at 3366:20-3367:6 (emphasis added).

## 2.   Insufficiency of Mens Rea Charge

Bourke also contends that the Court's *mens rea* instruction was insufficient because it failed to instruct the jury that it was required to find that he acted "corruptly" and "willfully," which is the intent required for a conviction under the FCPA.[153]  Indeed, the Supreme Court has held that "in order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself."[154]  Bourke argues that although the Court instructed the jury on the "willfully" and "corruptly" element of a substantive FCPA offense, it specifically directed the jury that it did not have to find that the Government satisfied each of the substantive FCPA elements in order to find that Bourke had engaged in a conspiracy to violate the FCPA.[155]  Bourke also asserts that the Court failed to include an explanation of "corruptly" and "willfully" when it instructed the jury with respect to the *mens rea* required for a conspiracy conviction.[156]

*First*, the jury was correctly instructed that the Government need not

---

[153]   *See* Bourke Mem. at 20.

[154]   *United States v. Feola*, 420 U.S. 671, 686 (1975).

[155]   *See* Bourke Mem. at 20-21.

[156]   *See id.* at 21.

prove all of the elements of the substantive crime of violating the FCPA.  The

Second Circuit has held that "conspiracy is a crime, separate and distinct from the

substantive offense."[157]  "A conspiracy conviction under [18 U.S.C.] § 371 requires

proof of three essential elements: (1) an agreement among two or more persons, the

object of which is an offense against the United States; (2) the defendant's

knowing and willful joinder in that conspiracy; and (3) commission of an overt act

in furtherance of the conspiracy by at least one of the alleged co-conspirators."[158]

And "[a]lthough the government need not prove commission of the substantive

offense or even that the conspirators knew all the details of the conspiracy, [] it

must prove that '*the intended future conduct they . . . agreed upon include[s] all*

*the elements of the substantive crime.*'"[159]

Second, while the portion of the conspiracy charge dealing with *mens*

*rea* does not instruct the jury in any single sentence that it must find that Bourke

intended corruptly and willfully to violate the FCPA, when read as a whole, the

conspiracy charge *does* instruct the jury of that requirement.  The charge explained

that the jury must first find that a conspiracy existed and that "the conspiracy

---

[157]    *United States v. Pinckney*, 85 F.3d 4, 8 (2d Cir. 1996).

[158]    *Svoboda*, 347 F.3d at 476.

[159]    *Pinckney*, 85 F.3d at 8 (quoting *United States v. Rose*, 590 F.2d 232,
235 (7th Cir. 1978), *cert. denied*, 442 U.S. 929 (1979)).

intended to achieve one, but not necessarily both, of the objectives alleged in the indictment."[160] It then instructed the jury that the two objects of the conspiracy were (1) to violate the FCPA; and (2) to violate the Travel Act by traveling in interstate commerce or using interstate commerce for the purpose of violating the FCPA.[161] It also instructed the jury that in order for a defendant to violate the FCPA, he must have "intended to act corruptly and willfully."[162] Finally, the charge directed the jury that in order to convict Bourke of the conspiracy offense, it must determine that he "participated [in the conspiracy] with knowledge of at least some of the purposes or objectives of the conspiracy *and with the intention of aiding in the accomplishment of those unlawful ends.*"[163] Read altogether, the charge instructed the jury that – before it could convict Bourke – it was required to find that Bourke participated in a conspiracy with knowledge of and the intention to further its objective of corruptly and willfully bribing foreign officials.

Alternatively, Bourke cannot dispute that the Court instructed the jury to find that Bourke must have knowledge of and share the intent to further the

---

[160]    Tr. at 3361:13-14; 3362:13-15.

[161]    *See id.* at 3362:16-17; 3368:20-24; 3369:8-9.

[162]    *Id.* at 3364:7-15.

[163]    *Id.* at 3374:19-23 (emphasis added).

object of the conspiracy.  He also cannot contest the fact that the jury was

instructed that the object of the conspiracy was to violate the FCPA or the Travel

Act.  The Second Circuit has defined "corruptly" in the FCPA to signify not only

the "'general intent' present in most criminal statutes," but also "a bad or wrongful

purpose and an intent to influence a foreign official to misuse his official

position."[164]  Thus, the jury – by finding that Bourke knew of and intended to

violate the FCPA by bribing foreign officials – must necessarily have found him to

possess a corrupt and willful intent.[165]

    Bourke argues that the Court should have instructed the jury that it

must find that *he corruptly and willfully intended to join the conspiracy* to bribe

Azeri officials and that the Court's failure to do so was in error.[166]  Even if Bourke

is correct, there is no principled distinction between instructing the jury that it must

---

[164]    *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 327 F.3d 173, 183 (2d Cir. 2003).

[165]    Bourke attempts to mince words by arguing that the Court failed to use the word "corruptly" or explain that the term conveys that "the offer, payment, and promise was intended to influence an official to misuse his official position" while charging the jury with respect to the second element of conspiracy relating to intent.  Bourke Reply at 7 (quotation marks omitted).  But he cannot dispute that the jury found him guilty of engaging in a conspiracy to violate the FCPA.  The jury therefore had to find that he intended to offer or pay an official for the purpose of influencing that official and encouraging that official to misuse his position.

[166]    *See* Bourke Mem. at 21.

find that he: (1) corruptly and willfully intended to join the conspiracy with the purpose of corruptly and willfully bribing officials and (2) intended to join the conspiracy with the purpose of corruptly and willfully bribing officials. In either case, the jury would have been required to find that he possessed a corrupt and willful intent.

Bourke also cites to *United States v. Harrelson*, a Fifth Circuit decision in which the court reversed a conviction for conspiracy to commit murder where the instructions omitted the requirement that the jury find that the defendant acted with "premeditation" and "malice aforethought."[167] He argues that this Court made the same error as the district court in that case because it failed to instruct the jury that the *mens rea* required for a conspiracy conviction was the same as the *mens rea* for the substantive offense.[168] But in this case, unlike *Harrelson*, the jury was instructed not only to find that the intent of the conspiracy itself was "corrupt" and "willful"[169] but also – as discussed above – that Bourke himself possessed that

---

[167]    Bourke Reply at 7 (citing *United States v. Harrelson*, 766 F.2d 186, 188 (5th Cir. 1985)).

[168]    *See id.*

[169]    *See* Tr. at 3361:17-18 ("The government must prove that the conspiracy intended to achieve one, but not necessarily both, of the objectives alleged in the indictment").

same intent.[170]

The same can be said for the other case Bourke cites in his reply papers, *United States v. Curran*.[171]  There, the Third Circuit held that "[i]n order to prove a conspiracy, the government must show an agreement to commit an unlawful act combined with intent to commit the underlying offense."[172]  Once again, this instruction is consistent with the charge in this case.  The jury was told specifically that it had to find "a combination, an agreement, or an understanding of two or more persons to accomplish by concerted action a criminal or unlawful purpose."[173]  It was also instructed that "[t]he government must prove that the

_____

[170]    In fact, the Fifth Circuit in *Harrelson* found the holding in *Feola* to be subject to two interpretations, noting that *Feola* "speaks of a degree of intent which must be present for the conspiracy to exist, rather than one which must be present in each individual conspirator before he can be a member, and hence is not precisely conclusive of the issue before us today."  *See Harrelson*, 766 F.2d at 188 n.1.  In the first interpretation, it would "suffice that between at least two conspirators (or perhaps in one only) there existed the degree of intent required for conviction of the substantive offense, the others joining 'knowingly and wilfully' in the enterprise."  *Id.* at 188.  The second is that "no person should be convicted of conspiracy to commit a given crime without proof that he personally possessed that degree of criminal purpose."  *Id.*  While the Fifth Circuit agreed with the second of these two interpretations, this issue has not been addressed by Second Circuit.

[171]    *See* Bourke Reply at 7 (citing *United States v. Curran*, 20 F.3d 560, 571 (3d Cir. 1994) (quotation omitted)).

[172]    *Curran*, 20 F.3d at 571.

[173]    Tr. at 3361:14-17.

conspiracy intended to achieve" either a violation of the FCPA or the Travel Act.[174] There was therefore no error in my charge.[175]

### 3.    Failure to Include a Good Faith Charge

Bourke next asserts that the Court erroneously failed to instruct the jury on Bourke's good faith defense.[176] He argues that the Court should have adopted his requested charge, that "[i]f [] Bourke believed in good faith that he was acting properly in connection with the matters alleged in those counts, even if he was mistaken in that belief, and even if others were injured by his conduct, there

---

[174]    *Id.* at 3362:13-17; 3368:20-24.  Similarly, the Second Circuit's recent decision in *United States v. Shim* is inapposite.  There, the Circuit reversed the district court's ruling denying the defendants' request that it charge the jury with respect to an element of the substantive offense underlying the conspiracy charge. *See United States v. Shim*, — F.3d —, No. 08 Cr. 1834, 2009 WL 3127210, at *1 (2d Cir. Oct. 1, 2009).  By contrast, the jury in this case was instructed that the defendant must have intended every element of the substantive offense. *See* Tr. at 3362:16-3371:18.

[175]    Also, because the charge was proper, I make no determination as to whether Bourke adequately preserved his objection.  However, I note that Bourke's purported objection at the charge conference was less than clear. *See id.* at 2946:1-7 ("We're talking here about the intent required for the Count One conspiracy, and *it may well be that all of this captures what's required*, but what I think is missing and what I'd like to suggest is a clear statement that the intent required for the conspiracy includes, and must include[,] the intent required for the underlying substantive offense.") (emphasis added).

[176]    *See* Bourke Mem. at 22.

would be no crime."[177]

As noted, however, I specifically instructed the jury that "knowledge is not established [] if the person merely failed to learn the fact through negligence or if the person actually believed that the transaction was legal."[178]  I also charged the jury – in the intent portion of the conspiracy charge – that "the government must prove beyond a reasonable doubt that the defendant knew that he was a member of an operation or conspiracy that committed or was going to commit a crime, and that his action of joining such an operation or conspiracy was not due to carelessness, negligence or mistake."[179]

This principle was repeated again when I instructed the jury that it "must first find that [Bourke] knowingly joined in the unlawful agreement or plan."[180]  I then continued by defining the term "knowingly" as "deliberately and voluntarily," rather than the product of a "mistake or accident or mere negligence or some other innocent reason."[181]  And in the portion of the charge dealing with the false statement count, I instructed the jury that it must find that Bourke acted

---

[177]   *Id.*

[178]   Tr. at 3367:3-6.

[179]   *Id.* at 3372:11-16.

[180]   *Id.* at 3372:9-10.

[181]   *Id.* at 3372:21-25.

"knowingly and willfully" and also directed the jury to the part of the charge where the term "knowingly" is defined.[182]

Bourke further argues that the Second Circuit has approved the use of a conscious avoidance charge where "there was a genuine issue as to the defendant's good-faith ignorance of the illegality of his conduct," but notes that "in those circumstances, [] courts have given specific instructions on *both* conscious avoidance and the good-faith defense (or an equivalent, such as advice of counsel)."[183]  As noted above, the jury was in fact instructed on both conscious avoidance and the good faith defense.  Furthermore, Bourke specifically objected to the Government's request for an advice of counsel instruction.[184]  Although the Court considered including an advice of counsel instruction in the charge, it ultimately denied the Government's request for such instruction after the defense failed to make the argument in its closing that it was relying on such defense.[185]

--------

[182]    *See id.* at 3382:7-11.

[183]    Bourke Mem. at 25.

[184]    *See* 7/2/09 Email from Hal Haddon, counsel for Bourke, to Jessica Chan, my law clerk.

[185]    *See* Tr. at 3022:6-9 (THE COURT: "I don't know if we recirculated the current version that does add a sentence about burden of proof and good faith? Maybe we didn't.  But we also didn't decide whether to give it at all.  So that I will decide after summations); *id.* at 3334:15 (ruling, based on the summations, that the instruction would not be given to the jury).

Bourke's motion for a new trial on this ground is therefore denied.

### 4. Failure to Include Charge Regarding Agreement on Overt Act

Bourke contends that the Court also erred by failing to include a charge instructing the jury that – in order to convict him of Count One – it must agree unanimously on the overt act.[186] Bourke asks the Court to grant him a new trial "before a properly-instructed jury to remedy this violation of [his] right to a unanimous jury verdict."[187]

In declining to give this instruction, I reviewed the authorities cited by Bourke and the Government. I noted that although the Second Circuit has not addressed this issue, both the Fifth and Seventh Circuits have held that unanimity on the overt act is not required for a conviction of conspiracy.[188] I also noted that the Supreme Court had considered a similar issue in *Richardson v. United States*, where it held that the jury must agree unanimously on the violations constituting the continuing criminal enterprise offense because those violations were elements

---

[186]   *See* Bourke Mem. at 26.

[187]   *Id.* at 27.

[188]   *See* Tr. at 3023:3-19 (citing *United States v. Griggs*, Nos. 06 Cr. 4211, 06 Cr. 4212, 06 Cr. 4271, 07 Cr. 1940, and 07 Cr. 2012, 2009 WL 1767269 (7th Cir. June 24, 2009) and *United States v. Sutherland*, 656 F.2d 1181 (5th Cir. 1981)).

of the crime.[189]  Reasoning that because an overt act is not required to be a crime,[190]

the indictment need not identify which overt act was committed,[191] and the overt

acts proven at trial can vary from the overt acts in the indictment,[192] I found that the

overt act was closer to a "possible set of underlying brute facts [that] make up a

particular element" rather than an element itself.[193]

Bourke makes no new and persuasive arguments in support of his

position that the jury was required to agree unanimously on the same overt act.[194]  I

---

[189]    *See id.* at 3023:20-3024:5 (citing *Richardson v. United States*, 526 U.S. 813, 817 (1999)).

[190]    *See Braverman v. United States*, 317 U.S. 49, 53 (1942) ("The overt act, without proof of which a charge of conspiracy cannot be submitted to the jury, may be that of only a single one of the conspirators and need not be itself a crime.").

[191]    *See Schad v. Arizona*, 501 U.S. 624, 631 (1991) ("Our cases reflect a long-established rule of the criminal law that an indictment need not specify which overt act, among several named, was the means by which a crime was committed.").

[192]    *See Kaplan*, 490 F.3d at 129 ("[W]e have routinely found that no prejudice results from a variance between overt acts charged in an indictment and those proved at trial.").

[193]    *See* Tr. at 3024:6-17 (quoting *Richardson*, 526 U.S. at 817).

[194]    Bourke cites to the Third Circuit case of *United States v. Echeverri*, 854 F.2d 638 (3d Cir. 1988), in his reply. *See* Bourke Reply at 13. But *Echeverri* is distinguishable because the defendant was on trial for the offense of continuing criminal enterprise, in which each violation is considered an element of the crime. *See Echeverri*, 854 F.2d at 642. Thus, the jury was required to unanimously agree as to each violation that together constituted the offense. *See id.* at 643. *Echeverri*

therefore find no reason to reconsider my ruling.  Bourke's motion for a new trial

on this ground is therefore denied.

### 5.   Failure to Charge the Jury Regarding the Lawful Under Azeri Law Defense

The FCPA provides an affirmative defense to criminal liability if "the

payment, gift, offer, or promise of anything of value that was made, was lawful

under the written laws and regulations of the foreign official's country."[195]  Article

171 of the Azerbaijan Criminal Code provides that "[g]iving a bribe shall be

punished by deprivation of freedom for a term of from three to eight years . . . .  A

person who has given a bribe shall be *free* from criminal responsibility if with

respect to him there was extortion of the bribe or if that person after giving the

bribe voluntarily made a report of the occurrence."

On September 11, 2008, this Court held a hearing to resolve

disagreements between the parties with respect to whether Bourke was entitled to

jury instructions on the reporting and extortion exceptions.[196]  After extensive

testimony from two experts, I issued an Opinion and Order on October 21, 2008,

---

was also issued prior to the Supreme Court's decision in *Richardson* where the
same issue was presented and definitively resolved.

[195]    15 U.S.C. § 78dd-2(c)(1).

[196]    *See United States v. Kozeny*, 582 F. Supp. 2d 535, 537 (S.D.N.Y.
2008).

declining to instruct the jury of the reporting and extortion exceptions of Article 171.[197]

I reasoned that although a bribe-payer is absolved from criminal responsibility if he is extorted or if he reports the bribe to a state official, his actions are not deemed lawful under Azeri law.[198]  To the contrary, I noted that a Resolution published by the Supreme Court of the U.S.S.R. – which both experts agreed was relevant to the Azeri courts' interpretation of the Article – had noted that the absolution of criminal liability "'does not signify an absence in the actions of such persons of the elements of an offense.'"[199]  Because the FCPA provides a defense for lawful *payments* under foreign law, I found it irrelevant that Azeri law absolves the *bribe-payer* from responsibility.[200]  I reasoned that

> there is no immunity from prosecution under the FCPA if a person could not have been prosecuted in a foreign country due to a technicality (e.g., time-barred) or because a provision in the foreign law 'relieves' a person of criminal responsibility.  An individual may be prosecuted under the FCPA for a payment that violates foreign law

---

[197]   *See id.* at 541.

[198]   *See id.* at 539.

[199]   *Id.* at 538-39 (quoting Resolution of the Plenum of the Supreme Court of the U.S.S.R. of March 30, 1990, No. 3, "On Court Practice in Bribery Cases," Ex. C to 4/7/08 Declaration of Professor Paul B. Stephan, Bourke's expert.).

[200]   *See id.* at 539.

even if the individual is relieved of criminal responsibility
for his actions by a provision of the foreign law.[201]

Nevertheless, I also noted that my ruling did not preclude Bourke

from arguing at trial that the payments were extorted and therefore that he lacked

the requisite corrupt intent required for the offense.[202]  Additionally, I ruled that the

legislative history of the FCPA makes a distinction between payments "'demanded

on the part of a government official as a price for gaining entry into a market or to

obtain a contract'" and payments made to an official "'to keep an oil rig from

being dynamited,'" an example of "'true extortion.'"[203]  I therefore held that if

Bourke provided an evidentiary foundation at trial that he was a victim of true

extortion, the jury would be instructed with respect to the corrupt intent the

Government must prove Bourke possessed before it may convict him of the

offense.[204]

Bourke filed a motion for reconsideration of the Court's October 21,

2008 Opinion and Order, which the Court denied in a Memorandum Opinion and

---

[201]   *Id.*

[202]   *See id.* at 540.

[203]   *Id.* (quoting S.Rep. No. 95-114, at 10-11 (1977), reprinted in 1977
U.S.C.C.A.N. 4098, 4108).

[204]   *See id.*

58

Order dated December 15, 2008.[205]  Bourke now argues again that the Court's

October 21, 2008 ruling "was in error and prejudiced [] Bourke's defense."[206]  He

contends that the Government's trial witnesses confirmed that the early bribes were

the product of extortion by Azeri officials.[207]  For instance, he notes that both John

Pulley, Kozeny's security consultant, and Farrell testified that the first payment

occurred after Azeri officials arrested an Oily Rock courier carrying millions of

dollars in cash and vouchers.[208]  He also notes that a number of meetings took place

between Kozeny and state officials after the arrest, during which "the officials

demanded that they be given an interest in two-thirds of the Oily Rock's vouchers

in return for releasing the courier, permitting Oily Rock to continue purchasing

privatization vouchers, and relieving the company from paying protection money

---

[205]     *See United States v. Kozeny*, No. 05 Cr. 518, 2008 WL 5329960, at *2
(S.D.N.Y. Dec. 15, 2008).

[206]     Bourke Mem. at 44.

[207]     *See id.* at 49.

[208]     *See id.* (citing Tr. at 241:5-244:1 (Pulley testifying that after two
couriers had been arrested and their vouchers seized, he, Farrell, and Kozeny had
met with Nuriyev and Nasibov); 423:8-425:18 (Farrell testifying that after a
courier and a Chechen security officer had been arrested by state authorities, Uncle
Ali of the Chechen mafia had managed to schedule a meeting between Kozeny and
Ilham Aliyev, the President's son and the Vice President of SOCAR)).

to the Chechen mafia."[209]

However, Bourke ignores the fact that prior to the arrest of the
courier, Kozeny had already instructed Farrell to make contacts with the Azeri
government and had approved the payment of ten thousand dollars in exchange for
a meeting with an official.[210]  In addition, Bourke fails to acknowledge that Kozeny
had first proposed to Nuriyev and Nasibov that he would give them one-half of the
vouchers in return for their help and cooperation in the venture, even if the officials
ultimately succeeded in convincing Kozeny to increase their interest in the venture
to two-thirds.[211]

Aside from the fact that Bourke never raised this extortion argument
at trial, I charged the jury on the requisite corrupt intent Bourke must have had
before he could be convicted of the conspiracy offense.[212]  The jury was thus

---

[209]     *See id.* (citing Tr. at 429:23-435:14 (Farrell testifying that during the
ensuing meetings with Nuriyev and Nasibov, the parties came to an agreement that
the officials would receive two-thirds of the vouchers for no consideration)).

[210]     *See* Tr. at 412:5-413:9 (Farrell testifying that Kozeny had wanted
Farrell to establish contacts in the Azeri government and that he had been able to
arrange a meeting with a state official in return for ten thousand dollars which
Kozeny readily paid).

[211]     *See id.* at 432:1-433:14 (Farrell testifying that Kozeny had offered to
give fifty percent of the vouchers he was purchasing to the Azeri officials, but that
the officials had counter-offered by asking for a two-thirds interest).

[212]     *See id.* at 3364:7-15.

instructed that if it determined that Bourke and the others in the alleged conspiracy lacked the required intent – as would be the case if they were coerced to make payments – it would be required to acquit Bourke.  Bourke's motion for a new trial is therefore denied.

### 6.    Failure to Include "Mere Offer" Charge

As part of his motion for reconsideration of the Azeri law defenses, Bourke also moved for inclusion of an instruction in the jury charge that a "mere offer" of payment – without any transfer of the payment – is not a bribe under Azeri law and therefore is not a violation of the FCPA.[213]  At the time of the motion for reconsideration, the Court declined to rule on this requested charge, noting that Bourke had not specifically made such a request in his briefing on the Azeri Law motion.[214]  In any event, I also noted that "Bourke ha[d] not been charged [in the Indictment] with making a 'mere offer.'"[215]  Nevertheless, I held that if Bourke was able to show at trial that he was entitled to a "mere offer" charge, I would decide at that time whether and in what manner I would give such

---

[213]    *See Kozeny*, 2008 WL 5329960, at *1.

[214]    *See id.*

[215]    *Id.*

61

an instruction.[216]

   At trial, Bourke requested such a charge again.  While I entertained his request, I ultimately declined to give this instruction after hearing Bourke's summation and determining that he was not relying on such a defense.[217]  Bourke now asserts that "certain of the unlawful FCPA bribes alleged by the Government as predicates of the conspiracy [] were never proven to have been consummated."[218]  He contends that the Court's omission of a "mere offer" charge was therefore error and argues that he is entitled to a new trial on this ground.[219]

   The Second Circuit has held that refusal to give a requested defense charge is not error unless "the requested instruction is 'legally correct, *represents a theory of defense with basis in the record that would lead to acquittal*, and the theory is not effectively presented elsewhere in the charge.'"[220]  Besides the fact that Bourke never attempted to argue the "mere offer" defense, Bourke's requested charge has no basis in fact and would have served only to confuse the jury.

---

[216]   *See id.*

[217]   *See* Tr. at 3334:16.

[218]   Bourke Mem. at 29.

[219]   *See id.* at 28.

[220]   *United States v. Kerley*, 544 F.3d 172, 177 (2d Cir. 2008) (quoting *United States v. Doyle*, 130 F.3d 523, 540 (2d Cir. 1997)) (emphasis added).

The Government decided to drop the substantive FCPA offense on the eve of trial and proceed to trial only on the conspiracy offense. The Government was therefore not required to show that any of the bribes were actually consummated. In addition, Bourke sought this instruction on the premise that there was a *possibility* that the jury might convict him of participating in a conspiracy to *merely offer* bribes, but not to actually pay them – in other words that the object of the conspiracy was only to offer bribes to officials. But such theory makes no sense.[221]  Bourke's motion for a new trial on this ground is therefore also denied.

---

[221]   Although I decline to rule on the issue of whether a "mere offer" to bribe is "lawful under the written laws and regulations" of Azerbaijan and therefore that it is an affirmative defense to a violation of the FCPA, I note that such exception is neither included in Article 171 nor was it shown to be included in any other written law or regulation.

## V.   CONCLUSION

For the reasons set forth above, Bourke's Rule 29 and Rule 33 motions are denied in their entirety.  The Clerk of the Court is directed to close this motion (document no. 236).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            October 13, 2009

64

## - Appearances -

**For the Government:**

Harry Chernoff
Iris Lan
Assistant United States Attorneys
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2200

**For Defendant Bourke:**

Harold A. Haddon, Esq.
Saskia A. Jordan, Esq.
Haddon Morgan Mueller Jordan Mackey & Foreman P.C.
150 E. 10th Avenue
Denver, CO 80203
(303) 831-7364

John D. Cline, Esq.
K.C. Maxwell, Esq.
Jones Day LLP
555 California Street, 26th Floor
San Francisco, CA 94104-1500
(415) 626-3939

James David Reich, Jr., Esq.
Christopher Paolella, Esq.
Winston & Strawn LLP
200 Park Avenue
New York, NY 10166
(212) 294-6700