| | |
|---|---|
| HADDON, MORGAN AND FOREMAN, P.C. | LAW OFFICE OF JOHN D. CLINE |
| Harold A. Haddon (HH-3929) | John D. Cline (JC-7132) |
| *(ADMITTED PRO HAC VICE)* | *(ADMITTED PRO HAC VICE)* |
| Saskia A. Jordan (SJ-8927) | K.C. Maxwell (KM-8102) |
| *(ADMITTED PRO HAC VICE)* | *(ADMITTED PRO HAC VICE)* |
| 150 E. 10th Avenue | 115 Sansome Street, Suite 1204 |
| Denver, CO  80203 | San Francisco, CA  94104 |
| Tel:  303-831-7364 | Tel:  415-322-8319 |
| Fax:  303-832-2628 | Fax:  415-524-8265 |

Michael E. Tigar
*(OF COUNSEL)*
552 Fearrington Post
Pittsboro, NC 27312
Tel:  202-549-4229

*Attorneys for Defendant*
*Frederic A. Bourke, Jr.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------X

| | |
|---|---|
| UNITED STATES OF AMERICA, | 05 Cr. 518 (SAS) |
| PLAINTIFF, | |
| V. | **MEMORANDUM IN SUPPORT OF MOTION OF FREDERIC A. BOURKE, JR. FOR NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE** |
| FREDERIC BOURKE, JR., | |
| DEFENDANT. | |

---------------------------------------------------X

i

## TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................... 1

**BACKGROUND** ..................................................................................................... 2

**ARGUMENT** ........................................................................................................ 11

    **I.   THE PROSECUTORS KNEW OR SHOULD HAVE KNOWN THAT BODMER'S TESTIMONY ABOUT THE FEBRUARY 6 "WALK TALK" WAS FALSE.** ......................................................................... 11

    **II.  THE PROSECUTORS' KNOWING PRESENTATION OF BODMER'S FALSE "WALK TALK" TESTIMONY REQUIRES REVERSAL** ......... 15

**CONCLUSION** ..................................................................................................... 16

# TABLE OF AUTHORITIES

## CASES

*Banks v. Dretke*, 540 U.S. 668 (2004) ................................................................................9

*Drake v. Portuondo*, 553 F.3d 230 (2d Cir. 2009) ..........................................................2, 13

*Giglio v. United States*, 405 U.S. 150 (1972) ...................................................................12

*Mooney v. Holohan*, 294 U.S. 103 (1935) .....................................................................1, 12

*Napue v. Illinois*, 360 U.S. 264 (1959) ..........................................................................1, 12

*Northern Mariana Islands v. Bowie*, 243 F.3d 1109 (9th Cir. 2001) ................................11

*United States v. Agurs*, 427 U.S. 97 (1976) ......................................................... 12, 13, 15

*United States v. Blair*, 958 F.2d 26 (2d Cir. 1991) ...........................................................15

*United States v. Camacho*, 302 F.3d 35 (2d Cir. 2002) ......................................................2

*United States v. GAF Corp.*, 928 F.2d 1253 (2d Cir. 1991) ................................................2

*United States v. Helmsley*, 985 F.2d 202 (2d Cir. 1993) ....................................................9

*United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984) .......................................................2

*United States v. Vozzella*, 124 F.3d 389 (2d Cir. 1997) ..............................................13, 15

*United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991) .................................... 1, 13, 14, 15

*United States v. Zichettello*, 208 F.3d 72 (2d Cir. 2000) ..................................................15

*Wei Su v. Filion*, 335 F.3d 119 (2d Cir. 2003) .............................................................2, 13

## INTRODUCTION

The recent oral argument in the Second Circuit revealed a startling fact, previously unknown to the defense: The prosecution knew *before key government witness Hans Bodmer testified* that flight records from Viktor Kozeny's plane refuted Bodmer's account of the February 6, 1998 "walk talk" with defendant Frederic A. Bourke, Jr. Despite this knowledge, the prosecution presented Bodmer's false testimony, buttressed it with his time records and Rolf Schmid's redacted memorandum, and built its theory of the case around a chronology it knew to be wrong.

At the oral argument, AUSA Harry Chernoff justified sponsoring Bodmer's falsehoods on the ground that it would have been "utterly improper" to have "rehabilitate[d]" him during "witness prep" by showing him the flight records. But the alternative the prosecution chose was far worse. Presentation of testimony a prosecutor knows (or even *should know*) to be false violates due process under *Mooney v. Holohan*, 294 U.S. 103 (1935), *Napue v. Illinois*, 360 U.S. 264 (1959), and their progeny, including *United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991). The prosecutor's stunning admission at oral argument leaves little doubt that the government violated Bourke's right to due process through its presentation of Bodmer's testimony.

This is a matter of the utmost importance. The United States presented false testimony from a richly rewarded criminal to convict a distinguished American. It rested its theory of the case in opening statement on the falsehood. It sought to corroborate the falsehood during trial with documents and testimony. Confronted by the defense with the cooperator's falsehood, the prosecutors stipulated to the actual facts, but refused to

1

disavow the cooperator's story.  Instead, they characterized the falsehood as a mere "mistake," invented a new, equally false story in closing argument, and, when that story collapsed, concocted yet another false story on appeal.  In their zeal to convict, the prosecutors have forgotten that they are "officer[s] of the court whose duty is to present a forceful and truthful case to the jury, not to win at any cost.'"  *Drake v. Portuondo*, 553 F.3d 230, 240 (2d Cir. 2009) (quoting *Wei Su v. Filion*, 335 F.3d 119, 126 (2d Cir. 2003)).  The prosecutors' shifting stories--all of which may be imputed to the government as admissions, *see, e.g., United States v. GAF Corp.*, 928 F.2d 1253, 1259-61 (2d Cir. 1991)--represent precisely the kind of "abuse and sharp practice" that the Second Circuit has condemned, *e.g., United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984).

Bourke requests an evidentiary hearing to determine when the prosecution knew or should have known Bodmer's testimony was false, followed by a new trial on the two remaining counts of conviction.[1]

## BACKGROUND

The prosecution's theory of the case, laid out in opening statement, was both simple and damning.  Prosecutor Robertson Park told the jury that the evidence would show that Bourke had been hesitant to invest with Kozeny in Azerbaijan until he learned from Bodmer that Kozeny was bribing the Azeris.  The February 6, 1998 "walk talk" with Bodmer was the key to this theory.  Prosecutor Park told the jury that on one of

---

[1] This matter is currently pending on appeal.  Under Fed. R. Crim. P. 33, the Court has jurisdiction to consider this motion, conduct an evidentiary hearing, and deny the motion, but it may not grant the motion without requesting a remand from the Second Circuit.  *See United States v. Camacho*, 302 F.3d 35, 36-37 (2d Cir. 2002) (per curiam).

2

Bourke's pre-investment trips to Baku, Bodmer had "told the defendant about the Azeri's two-thirds interest in Oily Rock's vouchers, about all of the holding companies, and about all the structure that gave the Azeri officials a huge incentive to privatize SOCAR." T. 94-95.[2] The prosecutor continued:

> Bourke was sold. The evidence will show that the defendant went back home and *within days* instructed his lawyers to organize his own offshore company in the British Virgin Islands, a company named Blueport. *And then in March, 1998 he funded his investment in Oily Rock* with about $5 million in his own money and another 2 million he raised from friends and family.

T. 95 (emphasis added).

Bourke had met with Bodmer in Baku only once before his investment in March 1998--on an early February 1998 trip with Kozeny and American investor Bobby Evans. To support the government's theory, therefore, it was essential for Bodmer to testify that he had told Bourke about the bribery on that February trip. On direct examination, under carefully scripted questioning by prosecutor Park (who presumably had spent many hours preparing him), Bodmer testified that on the late afternoon of February 5, 1998 Bourke approached him in the lobby of the Baku Hyatt and asked about the "arrangement" with the Azeris; that Bodmer met Kozeny that evening in his hotel room in Baku and obtained permission to tell Bourke about the agreement to give President Aliyev two-thirds of the Oily Rock vouchers and options; and that at 8 am on February 6, 1998, Bodmer and Bourke took a fifteen-minute walk near the Hyatt during which Bodmer told Bourke

---

[2] The trial transcript pages cited in this memorandum are attached as Exhibit A to the accompanying Declaration of Harold A. Haddon ("Haddon Dec.").

3

about that agreement. T. 1064-74. According to Bodmer, "[a]bout two weeks" after the February 6 walk, Bourke agreed to invest. T. 1075-76.

The prosecution did not inform the defense, the Court, or the jury, that it was eliciting false testimony from Bodmer about the February 5 discussions with Bourke and Kozeny and the February 6 "walk talk." To the contrary, it sought to corroborate that testimony by introducing Bodmer's time records from February 5 and 6 (GX 269A, Haddon Dec. Ex. B), which included a reference to Evans and Bourke on February 6, and by having Bodmer testify that, after some initial uncertainty, he had pinpointed the February dates because he remembered that Evans was with him in Baku on the occasion of the "walk talk" and the February trip was the only time he and Evans had both been in Baku. T. 1073-74. The prosecution likewise called Rolf Schmid (Bodmer's Swiss law partner) and introduced a fragment of his memorandum (while persuading the Court to exclude other portions that undercut its credibility) to corroborate Bodmer's false testimony about the February 6 "walk talk."[3]

Within days after Bodmer completed his testimony, the defense notified the prosecution that it intended to call a witness from Universal Aviation, the flight control company that had made the ground arrangements for Kozeny's plane on the February trip. The witness would authenticate and explain flight records that the government had produced to the defense in discovery. Those records showed that Bourke and Kozeny were in London--not in Baku--on February 5. Thus, the records refuted Bodmer's

---

[3] The defense objected to the exclusion of other portions of the Schmid memorandum under Fed. R. Evid. 106 and argued that those portions were essential to place in context the fragment of the memo that the prosecution offered.

4

testimony that Bourke asked him about the "arrangement" on February 5 in Baku, and that Bodmer met with Kozeny in a Baku hotel to obtain Kozeny's approval to discuss it with Bourke. GX 1100; DX A-15-A, A-15-D; T. 2534-36, 2543.[4] The records (and Evans' daily diary, which the defense introduced through Evans, DX N-15-A) proved as well that Kozeny's plane did not land in Baku until 9:20 am on February 6, over an hour after Bodmer claimed the "walk talk" had occurred. *Id*. Near the end of its case, the government stipulated to these facts. T. 2501.

Despite Bodmer's false testimony, the government continued to rely on his claim to have told Bourke about the arrangement with the Azeris. It did not recall Bodmer to explain the false dates or introduce other evidence on that point. Instead, it waited until closing argument and then contended that the alleged "walk talk" occurred at the Minaret opening in late April 1998, *the only other time Bodmer and Bourke were both in Baku*. T. 3097-98, 3282; GX 1100.

The government's theory that the walk talk occurred in April 1998--what it called in closing the "April option," T. 3098--has no support in Bodmer's testimony or any other evidence. Bodmer described the Minaret opening and surrounding events, including specific conversations and meetings, but said nothing about walking with Bourke. T. 1126-39.

Bodmer's testimony contradicts the "April option" theory in two critical respects. First, as noted above, Bodmer testified (consistent with the prosecution's theory at the

---

[4] GX 1100, DX A-15-A, DX A-15-D, and DX N-15-A are attached as Haddon Dec. Exs. C, D, E, and F, respectively.

5

time) that Bourke made his first investment "[a]bout two weeks" *after* the alleged walk talk.  T. 1075-76.  But Bourke made that investment in mid-March 1998, more than a month *before* the Minaret opening in April.  It is inconceivable that Bodmer made an innocent mistake about the sequence of the "walk talk" and Bourke's investment, given how important it was to the prosecution's case.

Second, Bodmer testified with certainty that the walk talk occurred on an occasion when Evans accompanied Bourke to Baku.  T. 1064-65, 1073-74, 1305-08.  He even claimed to have seen Bourke and Evans in the hotel breakfast room together after the walk.  T. 1070-71, 1306.  But Evans was not in Baku in April 1998, and Bodmer never met him other than on the February 1998 trip to Baku.  T. 1074.  Bodmer's confident testimony about Evans' presence, designed to anchor the "walk talk" to February 6 and thus establish the chronology that prosecutor Park highlighted in opening, destroys the "April option" that the government promoted in closing argument.

Schmid's testimony further refutes the government's closing argument "April option."  Schmid (like Bodmer) testified *before* the defense exposed Bodmer's story about the February 6 "walk talk" as false, when the government still sponsored that version.  Schmid claimed that Bodmer told him about the walk talk with Bourke at the "beginning of 1998," T. 1366-67, either "January or February," T. 1397.  That testimony supported Bodmer's February 6 version of the walk talk but conflicts with the "April option."  In addition, Schmid and Bodmer both made clear that Schmid was not with Bodmer in Baku on the alleged "walk talk" trip.  T. 1074-75, 1367-68.  But Schmid *was* with Bodmer at the Minaret opening in April 1998--the only time he and Bodmer traveled to Baku

6

together. T. 1126, 1357, 1364-66. In this respect too Schmid's testimony refutes the "April option."[5] In short, the government invented the "April option" out of whole cloth to try to salvage its well-rewarded cooperator.

Bourke exposed these fatal problems with the "April option" in his opening brief to the Second Circuit. Brief for Defendant-Appellant-Cross-Appellee Frederic Bourke Jr. at 11-15. In its response brief, the government concocted a new theory. It suggested that "Bodmer was . . . mistaken about consulting with Bourke and Kozeny on the day before the conversation with Bourke about the corrupt arrangement," but that his testimony about meeting Bourke on February 6 was otherwise correct. Brief for the United States of America at 11-12 n.* (Haddon Dec. Ex. H).

The government's new theory is as false as the discredited "April option." Bodmer testified in detail about the purported conversations with Bourke and Kozeny on February 5, the day before the alleged February 6 "walk talk" with Bourke. He described the location of the alleged conversations, the time of day, and what was said. He recalled others who were present in Baku, including Evans. He remembered that the alleged "walk talk" with Bourke occurred the next day. T. 1065-73, 1303-05. It is inconceivable

---

[5] Nor does the government's revised theory square with common sense. On his trip to the Minaret opening, Senator Mitchell met President Aliyev and received his assurance that SOCAR would be privatized in due course. T. 534-35, 1643-44, 1696-97. He and Bourke then met the President's son Ilham--head of SOCAR--and received similar assurances. T. 1645, 1697. It is implausible that after receiving these assurances from the President and the head of SOCAR, Bourke would be so anxious about privatization that he would ask Bodmer (and Farrell) about improper arrangements. The timing of Bourke's sole investment of his own money--March 1998--also refutes the "April option." It makes no sense that Bourke would invest in March, *before* he learned of the alleged bribes (according to the false "April option"), but never invest his own money *after* he learned of the alleged bribes.

7

that Bodmer produced his richly detailed--and completely false--narrative about the events of February 5 by "mistake."

The government's "February 5 mistake" theory has further problems. It ignores that Bodmer's story about the February 6 "walk talk" with Bourke is impossible in light of the flight records and Evans' daily diary and testimony. It is undisputed that Bourke was in the air on Kozeny's plane, and not in Baku, at 8 a.m. on February 6, when Bodmer said the walk occurred. T. 2501. Evans' diary and testimony show, beyond any dispute, that Evans was with Bourke for the entire six hours they were in Baku on February 6; Bourke and Bodmer were never alone together. T. 2542. Thus, the government could not salvage the February 6 "walk talk" even if it could plausibly explain Bodmer's false testimony about February 5 as a "mistake."[6]

This is more than a quibble about dates, as the prosecution has tried to portray it. The Bodmer "walk talk" was central to the prosecution's case. It could only have happened on two possible dates: February 1998 or April 1998. Those were the only times Bourke and Bodmer were both in Baku after Kozeny made the alleged "arrangement" with the Azeris. The flight records and Evans' diary and testimony prove the "walk talk" did not occur in February 1998. The Bodmer and Schmid testimony proves that it did not happen in April 1998. If the "walk talk" did not happen in February 1998 or April 1998, the only possible dates, then it did not happen at all. Bodmer did not

---

[6] Even after Bourke demonstrated in his reply brief on appeal that the government's "February 5 mistake" theory was wrong, the prosecutor advanced that theory at oral argument as a "plausible scenario." Oral Argument Transcript ("OA Tr.") 19. The oral argument transcript is attached as Haddon Dec. Ex. G.

8

merely confuse the dates or other details of an event that actually occurred; he fabricated the event itself.

Before the oral argument on February 10, 2011, defense counsel believed--based on the prosecutors' assurances--that the prosecution had no idea Bodmer's "walk talk" testimony was false until after he had left the stand, when the defense called the flight records to the prosecutors' attention.[7]  At oral argument, however, the government told a different and far more troubling story.  In response to Bourke's argument about Bodmer's false testimony, AUSA Harry Chernoff made the following astonishing statement:

> The dates with respect to Mr. Bodmer, I sort of am puzzled by Mr. Tigar's argument that because the government had the flight records, Mr. Bodmer should have been rehabilitated in his witness prep.  It would have been utterly improper for us to show him the flight records to point out to him that his recollection of these meetings was apparently flawed.

OA Tr. at 18-19.  This statement by AUSA Chernoff leaves little doubt that the government knew about the flight records during "witness prep" of Bodmer, but made a deliberate decision not to "rehabilitate[]" him--that is, not to correct testimony the prosecution knew from the records to be false.

AUSA Chernoff made other troubling assertions at oral argument.  The prosecutor contended, for example, that "[t]he fact of the matter is that the defendant was in Baku so

---

[7] The Court appears to have shared that view.  In its order denying Bourke's motion for new trial, it found "no evidence that the Government was aware" that Bodmer's testimony was incorrect.  October 13, 2009 Opinion and Order at 17.  The fact that the prosecutors previously told defense counsel that they were unaware of the flight records when Bodmer testified, followed by the apparent concession at oral argument that they did, distinguishes this case from *United States v. Helmsley*, 985 F.2d 202 (2d Cir. 1993), where a new trial motion was found to be untimely.  *See Banks v. Dretke*, 540 U.S. 668, 698 (2004) (where prosecutors represented they had "held nothing back," petitioner was "entitled to treat the prosecutors' submissions as truthful").

9

many times personally overseeing this investment that it is sort of understandable that the cooperators mixed up these dates years later." OA Tr. 17. Bourke was in Baku with Bodmer *only twice* after Kozeny allegedly began bribing the Azeris--once on February 6, 1998 and again in late April 1998 at the Minaret opening--not "many times," as the prosecutor asserted. The flight records and Evans' diary and testimony prove beyond any dispute that the "walk talk" did not happen on February 6. And Bodmer's testimony--that Evans was present in Baku on the "walk talk" trip, that Bourke invested two weeks later, and that Schmid was not in Baku when the conversation occurred--proves that it did not happen in April. Bodmer did not "mix up" the only two times he and Bourke were together in Baku; the "walk talk" did not happen on *either* of those visits.[8]

AUSA Chernoff compounded the effect of these misstatements in response to a question from the panel:

> JUDGE POOLER: There was cross-examination on the dates, wasn't there?
>
> MR. CHERNOFF: Absolutely, Your Honor.
>
> JUDGE POOLER: So that the jury knew that there was some error in memory or testimony. They had to decide that, correct?
>
> MR. CHERNOFF: Yes, Your Honor. The government conceded that Mr. Bodmer was obviously mistaken about some of the details of his recollection, either the dates or the parties present, because the flight records bore that out and those were stipulated to.

---

[8] The prosecutor also made a significant misstatement at oral argument about Farrell's alleged "walk talks" with Bourke. He stated that Farrell "thought that one of the conversations occurred in April and one occurred a few weeks later." OA Tr. 17. Farrell's actual testimony was that one walk talk occurred at the Minaret opening in late April and the other occurred several weeks *earlier*. The difference is critical, because Bourke was in Baku several weeks *after* the opening. He was not in Baku--and thus could not have gone on a "walk talk" with Farrell--several weeks *before* the opening. GX 1100.

10

OA Tr. 20. The prosecutor's affirmative response to the first question--"There was cross-examination on the dates, wasn't there?"--may have been literally true, but it was surely misleading. Because the government made up its "April option" theory in closing argument and its "February 5 mistake" theory on appeal, the defense never had an opportunity to cross-examine Bodmer about those theories or present additional evidence to counter them. Thus, Bodmer was not cross-examined on the dates in any meaningful sense.

## ARGUMENT

**I.  THE PROSECUTORS KNEW OR SHOULD HAVE KNOWN THAT BODMER'S TESTIMONY ABOUT THE FEBRUARY 6 "WALK TALK" WAS FALSE.**

Even before the startling disclosure at oral argument, it was evident that the prosecutors had failed in their "clear duty under our Constitution" to "collect potentially exculpatory evidence, to prevent fraud upon the court, and to elicit the truth." *Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1117 (9th Cir. 2001). Instead of disavowing Bodmer's testimony, or recalling him to be examined about his false story, it waited until closing argument, when the evidence was closed and Bodmer was safely out of the country, and then invented a new story for him, followed by still another new story on appeal. As Judge Trott put it under analogous circumstances, the prosecution "f[ound] it tactically advantageous to turn a blind eye to the manifest potential for malevolent disinformation" that flowed from the "concerted effort by rewarded criminals"--Bodmer and Farrell--"to frame" Bourke. *Id.* at 1114.

11

The oral argument raises an even more troubling possibility. AUSA Chernoff appeared to acknowledge that the government *knew* Bodmer's testimony about the February "walk talk" was false from the flight records *but made a deliberate choice to present that testimony anyway*. The prosecution even sought to corroborate the false story with Bodmer's time records and Schmid's partial memorandum. Worse yet, the prosecution based its theory of the case--that Bourke decided to invest with Kozeny almost immediately after learning from Bodmer about the bribery--on a chronology that it apparently knew to be false.

Until oral argument a few weeks ago, Bourke's defense had raised, in this Court and on appeal, the issues that Bodmer's false "walk talk" testimony appeared to present. AUSA Chernoff's oral argument concession and his accompanying misleading portrayal of events relating to Bodmer tip the scales decisively and raise for the first time the due process issue that is the subject of this motion.

The principles that govern here are well-established. The Supreme Court declared more than seventy-five years ago that obtaining a conviction through the "deliberate deception of court and jury by the presentation of testimony known to be perjured" is "inconsistent with the rudimentary demands of justice." *Mooney*, 294 U.S. at 112. In case after case since *Mooney*, the Court has reaffirmed this bedrock principle. *See, e.g., United States v. Agurs*, 427 U.S. 97, 103 (1976); *Giglio v. United States*, 405 U.S. 150, 153 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959). The Second Circuit recently summarized these cases: "'Since at least 1935, it has been the established law of the United States that a conviction obtained through testimony the prosecutor knows to be

12

false is repugnant to the Constitution.  This is so because, in order to reduce the danger of false convictions, we rely on the prosecutor not to be simply a party in litigation whose sole object is the conviction of the defendant before him. The prosecutor is an officer of the court whose duty is to present a forceful and truthful case to the jury, not to win at any cost.'"  *Drake*, 553 F.3d at 240 (quoting *Wei Su*, 335 F.3d at 126).

In federal criminal cases such as this, the principle extends even farther.  The Second Circuit has held that the prosecution violates a defendant's right to due process when it presents testimony "that it knew *or should have known* was false." *United States v. Vozzella*, 124 F.3d 389, 392 (2d Cir. 1997) (emphasis added); *see Agurs*, 427 U.S. at 103 ("knew or should have known"); *Wallach*, 935 F.2d at 456 (same).

*Wallach* is instructive.  In that case, the defense elicited testimony on cross-examination of a key prosecution witness--Guariglia--from which the government "should have been aware" that he had perjured himself when he denied gambling during his cooperation. *Id*. at 457.  Nonetheless, the government "sought to rehabilitate the witness on redirect, permitting Guariglia to testify that he had bought the chips but he had not gambled, even after defense counsel had disclosed to the government written records from the Tropicana Casino reflecting that Guariglia had gambled." *Id.*  Although the government convinced the court of appeals that it had "questioned Guariglia extensively" about his trips to Atlantic City after the defense discovered them, the court was "not satisfied that the government properly utilized the available information." *Id*.  Reversing the convictions, the court declared that "instead of proceeding with great caution [after learning of Guariglia's possible perjury], the government set out on its redirect

13

examination to rehabilitate Guariglia and elicited his rather dubious explanation of what had happened. . . . We fear that given the importance of Guariglia's testimony to the case, the prosecutors may have consciously avoided recognizing the obvious--that is, that Guariglia was not telling the truth." *Id*.

The conduct reflected in AUSA Chernoff's concession at oral argument is more egregious than in *Wallach*. The prosecutors apparently *knew* Bodmer's February 6 "walk talk" testimony was untrue, but presented it anyway. They made his false testimony the centerpiece of their opening statement. They sought to corroborate the false testimony with Bodmer's time records and the Schmid memorandum. Unlike the prosecutors in *Wallach*, they did not question Bodmer "extensively"--or at all--about his false story once the defense brought the flight records forward. And rather than recall Bodmer, they waited until the evidence was closed and then invented the false "April option" in closing argument, foreclosing cross-examination about it.[9] Under these circumstances--and, indeed, even if the prosecutors merely "should have known" from the flight records in their possession that Bodmer's February 5 and 6 testimony was untrue--the government violated Bourke's right to due process under *Wallach*.

---

[9] The prosecutor's assertion at oral argument that "it would have been utterly improper" to have shown Bodmer the flight records in "witness prep" is both wrong and beside the point. There is nothing improper in showing a witness documents in preparation to refresh his recollection, especially when the documents show conclusively that he is wrong on a critical point. And even if the government is correct, and it would have been "improper" to "rehabilitate" Bodmer in this manner during "witness prep," it does not follow that the government was permitted to put Bodmer on the stand to tell the false story, or that it could make that false story the centerpiece of its opening statement, or that it could try to corroborate that false story with Bodmer's time records and the Schmid memorandum, or that it could make up another false story--the "April option"--in closing argument to try to salvage Bodmer's "walk talk" testimony.

## II. THE PROSECUTORS' KNOWING PRESENTATION OF BODMER'S FALSE "WALK TALK" TESTIMONY REQUIRES REVERSAL.

When--as here--the prosecution uses testimony that it knows or should know is false, "the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Wallach*, 935 F.2d at 456 (quotation omitted); *see Agurs*, 427 U.S. at 103 (same); *Vozzella*, 124 F.3d at 392 (same).

The "reasonable likelihood" standard is easily satisfied here. Bodmer's false February 5 and 6 testimony was the centerpiece of the prosecution's case from opening statement on. Prosecutor Park carefully buttressed that testimony on direct with Bodmer's time records. The government called Schmid and introduced his redacted memorandum as further support for the false story. Even when the government was forced to stipulate that the testimony was wrong near the end of its case, it did not renounce Bodmer's account of his conversation with Bourke. Instead, it concocted the "April option" in closing argument--too late for Bourke to cross-examine Bodmer about it--and maintained that Bodmer had simply been confused about the date. Given the centrality of Bodmer's testimony to the case, there is at least a "reasonable likelihood" that his false testimony "affected the judgment of the jury." As in *Wallach* and *Vozzella*, Bourke's conviction must be reversed.[10]

---

[10] The government's fabrication of the "April option" in closing, its stubborn defense of Bodmer's credibility in the face of his obvious deception, and its failure to acknowledge that he had lied about the February 6 "walk talk" remove this case from the general rule that reversal is not required where a prosecution witness' perjury is "discovered and fully corrected during trial." *United States v. Blair*, 958 F.2d 26, 29 (2d Cir. 1991); *see, e.g., United States v. Zichettello*, 208 F.3d 72, 102 (2d Cir. 2000). Bodmer's false testimony was "discovered" during trial, but, because of the government's tactics, it was not--and has not yet been--"fully corrected."

## CONCLUSION

For the foregoing reasons, the Court should conduct an evidentiary hearing to determine when the prosecution knew (or should have known) that Bodmer's testimony about the February 6, 1998 "walk talk" was false.  Following the hearing, the Court should grant Bourke a new trial on the two counts of conviction.

Dated:  March 9, 2011

        Respectfully submitted,

*s/ Harold A. Haddon*
Harold A. Haddon
*ADMITTED PRO HAC VICE*
HADDON, MORGAN AND FOREMAN, P.C.
150 East 10th Avenue
Denver, CO 80203
Tel:  303-831-7364
Fax:  303-832-2628

*s/ John D. Cline*
John D. Cline (JC-7132)
K.C. Maxwell (KM-8102)
*ADMITTED PRO HAC VICE*
Law Office of John D. Cline
115 Sansome Street, Suite 1204
San Francisco, CA  94104
Tel:  415-322-8319
Fax:  415-524-8265

Michael E. Tigar
*(OF COUNSEL)*
552 Fearrington Post
Pittsboro, NC 27312
Tel:  202-549-4229

*Attorneys for Frederic A. Bourke, Jr.*