UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA

    - against -

FREDERIC BOURKE, JR.,

             **Defendant.**

-------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _12/15/11_
```

**OPINION AND ORDER**

**S2 05 CR 518 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.  INTRODUCTION

In October 2005, an Indictment was unsealed charging defendant Frederic Bourke, Jr. with conspiracy to violate the Foreign Corrupt Practices Act[1] ("FCPA"), substantive violations of the FCPA, violations of the Travel Act,[2] conspiracy to commit money laundering,[3] money laundering, and making false statements to an agent of the Federal Bureau of Investigation ("FBI").[4]  These charges stemmed from a complex and massive scheme to bribe government officials of the Republic of Azerbaijan ("Azerbaijan") to encourage the privatization of the State Oil Company of the Azerbaijan Republic ("SOCAR").

---

[1]    15 U.S.C. §§ 78dd-1 *et seq.*

[2]    18 U.S.C. § 1952.

[3]    *Id.* § 1956.

[4]    *Id.* § 1001.

The Indictment charged Bourke and others with violating the FCPA by making payments to Azeri officials in order to participate in the privatization of SOCAR.

On May 26, 2009, an S2 Superseding Indictment was filed charging Bourke with: conspiracy to violate the FCPA (Count 1ss); conspiracy to commit money laundering (Count 2ss); and making false statements (Count 3ss). On July 10, 2009, after a five-week trial, Bourke was convicted of conspiring to violate the FCPA and making false statements. Bourke subsequently moved, pursuant to Federal Rule of Criminal Procedure 29, for entry of a judgment of acquittal on both counts of conviction and, alternatively, for a new trial under Federal Rule of Criminal Procedure 33 ("Rule 33"). Both post-trial motions were denied by this Court.[5] On November 10, 2009, Bourke was sentenced to one year and one day in

---

[5]     *See United States v. Kozeny*, 664 F. Supp. 2d 369 (S.D.N.Y. 2009). In denying Bourke's first Rule 33 motion, this Court expressly rejected a finding of intentional perjury on Bodmer's part, stating as follows:

> There is no evidence that Bodmer committed perjury on the stand. . . . If he testified falsely, it appears to have been unintentional. There is also no evidence that the Government was aware of such discrepancy. Even if I determined that Bodmer had committed perjury by testifying falsely about the dates, I cannot say that the other evidence in the record, including Farrell's testimony that he spoke to Bourke about the corrupt arrangements in April 1998 – which was not impeached – was insufficient to demonstrate beyond a reasonable doubt that Bourke possessed the requisite knowledge of the scheme. I therefore also deny Bourke's Rule 33 motion.

custody and a fine in the amount of $1,000,000.00 was imposed.

On November 10, 2009, Bourke appealed his Judgment of Conviction to the Second Circuit. On December 14, 2011, the Second Circuit affirmed Bourke's conviction.[6] Despite the fact that his direct appeal was pending at the time, Bourke filed a second Rule 33 motion in this Court. In sum, Bourke seeks a new trial on the ground that the Government violated his right to due process through its presentation of the perjured testimony of Hans Bodmer, a cooperating witness. For the following reasons, defendant's motion is denied.

## II.   BACKGROUND

### A.   Discovery and Jencks Act Material

Following the unsealing of the original Indictment in 2005, the Government produced voluminous discovery to Bourke including flight records from the jet of co-defendant Viktor Kozeny. These flight records reveal that Bourke and Kozeny were in England on February 5, 1998, and that they did not arrive in Baku, Azerbaijan until 9:20 a.m. on February 6, 1998.

The trial began on June 1, 2009. Before the trial began, the Government produced to defense counsel the Jencks Act material for its witnesses.

---

*Id.* at 378. The instant motion is arguably precluded by the above findings.

[6]      *See United States v. Kozeny*, --- F.3d ---, No. 09-4704-cr(L), 2011 WL 6184494, at *15 (2d Cir. Dec. 14, 2011).

3

The first item produced for Bodmer was an FBI 302 interview report which stated:

> In February 1998 BODMER went to Baku to address a variety of administrative matters.  KOZENY, BOURKE, BOB EVANS, and JOHN PULLEY were all in Baku during this time. . . .
>
> During the February trip, BOURKE asked to meet with BODMER to discuss the investment.  Before the meeting, BODMER asked KOZENY for his permission to do so.  The next morning BODMER met BOURKE in the lobby of the Baku Hyatt and went for a walk around the hotel.  BOURKE bluntly asked about the arrangement with the Azeris.  This was the first time an investor had asked BODMER about the investment's details.[7]

The FBI 302, which was produced weeks before Bodmer's mid-trial testimony, offered a general preview of Bodmer's testimony, without providing specific dates and times.

**B.      The Trial**

In its opening statement, the Government anticipated Bodmer's testimony concerning Bourke's visit to Baku in February 1998, without referencing the contradictory evidence (the flight records) provided to Bourke years earlier.  At trial, Bodmer testified that on February 5, 1998, in the hotel lobby of the Baku

---

[7]      Ex. A to the Government's Memorandum of Law in Opposition to Defendant's Motion for New Trial Based on Newly Discovered Evidence ("Gov't Mem.").

4

Hyatt, Bourke asked Bodmer to explain the Azeri interests to him.[8]  Bodmer

testified that later that evening, in Kozeny's hotel room, he had asked Kozeny for

permission to explain the bribery scheme to Bourke.[9]  Bodmer further testified that

the next day, February 6, 1998, at 8:00 a.m., he and Bourke had a "walk and talk"

outside of the hotel, in which Bodmer explained the details of the bribery scheme.[10]

Bourke invested in the Azeri scheme shortly thereafter, some time in March 1998.

Contrary to Bodmer's testimony,  Kozeny's flight records revealed

that Kozeny and Bourke did not arrive in Baku on February 6, 1998, until 9:20

a.m.  Bodmer was thus mistaken as to the date and/or time of the "walk and talk"

with Bourke and the details of his conversations with Bourke and Kozeny the day

before.

Defense counsel cross-examined Bodmer, questioning Bodmer's

recollection of the details of the "walk and talk" and the preceding events.  Bodmer

stated that he was not sure if the preliminary meeting he had with Kozeny on

February 5, 1998 was in Kozeny's hotel room, but that was how he remembered

_____

[8]      *See* Trial Transcript ("Trial Tr.") at 1065.

[9]      *See id.* at 1067.

[10]     *See id.* 1067-1070.

it.[11]  Bodmer also stated that he was not sure where he first encountered Bourke on February 5, 1998, but he believed that it was in the lobby of the Baku Hyatt.[12] Bodmer confirmed that he had a conversation with Kozeny in the evening on February 5, 1998, followed by the "walk and talk" with Bourke the next morning on February 6, 1998.[13]  Defense counsel did not confront Bodmer with the flight records during his cross-examination.

After Bodmer was cross-examined, defense counsel brought the flight records and the inconsistency in Bodmer's testimony to the Government's attention.  Defense counsel proposed a stipulation to the Government which would admit the flight records into evidence without the need to call an authenticating witness.  Upon being presented with defendant's proposed stipulation, the Government reviewed the flight records, recognized the inconsistencies in Bodmer's testimony in light of those records, and offered the flight records in its case-in-chief through a summary witness and chart.[14]  The flight records conclusively established that Bourke and Kozeny did not arrive in Baku until 9:20

---

[11]     *See id.* at 1303.

[12]     *See id.* at 1305.

[13]     *See id.*

[14]     *See* Government Trial Exhibit 1100, Ex. C to the 3/9/11 Declaration of Harold A. Haddon ("Haddon Decl."), defendant's counsel.

a.m. on February 6, 1998.  Thus, if Bodmer spoke with Bourke and Kozeny before the incriminating "walk and talk,"  it was not on February 5, 1998, or it was not in person in Baku.

In summation, the Government conceded that Bodmer was obviously mistaken in his recollection of the details of the "walk and talk" he had with Bourke.  But the Government argued that the jury could still credit Bodmer's testimony about the substance of the conversation.  In discussing Bodmer's testimony, the Government stated the following:

> What we know from this testimony is that there has always been some uncertainty about the actual date, but the general time period is clear, and that is early spring of 1998.

> But what we do know also is that Mr. Bodmer's testimony, that [the] conversation with Mr. Bourke happened on February 6th, is incorrect.  And we know that because if the conversation happened on the 6th, there's no way that he could've met with Kozeny in person the night before, as he had testified.  Because as the flight records show, and as we explained in government exhibit 1100, the summary chart, neither Bourke nor Kozeny were in Baku on the 5th, because Bourke and Kozeny spent only six hours in Baku the following day, which was the 6th.  And as Mr. Bodmer testified, he was, himself, uncertain about the date, but he thought he could fix it to an entry in his time sheets by looking at them.[15]

---

[15]     Trial Tr. at 3097.

Defense counsel made the inconsistencies in Bodmer's testimony one of the focal points of his closing argument.  For example, in referring to Bodmer and Tom Farrell, another cooperating witness, Cline told the jury that "the amazing thing is that those thieves have come to court and they've given testimony that we have proven to be false."[16]  In referring to Bodmer's testimony, defense counsel stated:

> [Bodmer's testimony] fits the prosecution's story of this case perfectly.  The problem with it was, it wasn't true, it wasn't true.  We know Mr. Bodmer didn't tell the truth about this, because on February the 5th, 1998, when he said he was having that first conversation with Mr. Bourke, where Mr. Bourke was asking permission to be told about the arrangement, Mr. Bourke wasn't in Baku, he was in London.  We know he didn't tell the truth about the conversation that evening with Mr. Kozeny in Mr. Kozeny's hotel room at the Baku Hyatt, because on the evening of February 5th, 1998, Mr. Kozeny wasn't in Baku.  He was in London.  And we know he didn't tell the truth about that walk the next morning at 8:00 o'clock on February 6th because the plane that was carrying Kozeny and Bourke and Evans, and Pulley from London to Baku didn't land in Baku until 9:20 that morning Baku time.
>
> Now, how do we know all those things?  We know them from several sources.  We know them, for example, from the flight records.[17]

---

[16]    *Id.* at 3156.  *See also id.* at 3158 (referring to Bodmer and Farrell as "two crooks who have made amazing deals to keep themselves out of prison").

[17]    *Id.* at 3173-3174.  *See also id.* at 3175 ("So you know from the flight records that the story Bodmer told about what happened on February 5th, the walk

Defense counsel then proceeded to question the prosecutors' integrity by suggesting that the flight records had "surfaced" after the prosecution presented Bodmer's false testimony.  Defense counsel first commented on the parties' stipulation concerning the flight records, stating: "And then, at the very end of the prosecution's case, after it had put on Mr. Bodmer to give this testimony which proved to be false, after Mr. Bodmer was long gone, we had a stipulation from the government[.]"[18]  Defense counsel further commented: "So based on all of these records, all of which, by the way, surfaced long after Bodmer testified, long after he was gone from the witness stand, we know he didn't tell the truth."[19]  Defense counsel theorized about Bodmer's motivation to lie.

> There's no question, no question that Mr. Bodmer gave false testimony in this case.  We've proven it.  I don't think anybody disputes it.  They say it was an innocent mistake, but everybody agrees it was untrue, what he said about the events of February 5th and 6th.
>
> That testimony shows what can happen when the government puts pressure on someone to cooperate.  It shows how a man who is desperate to keep his freedom, as Mr. Bodmer is, who is desperate to go back home, who is desperate to be with his family, it shows that he will do

---

on February 6th, that that was false.").

[18]   *Id.* at 3175-3176.

[19]   *Id.* at 3176.  At this point, the Court sustained an objection from the prosecution objecting to the phrase "surfaced."  *See id.*

> almost anything. . . .  Because you see from what Mr.
> Bodmer did on the witness stand, what the kind of pressure
> that he's under can cause a person to do.[20]

Defense counsel then tempered his attack on the prosecutors by stating: "I am not suggesting for a minute that the prosecutors in this case put Mr. Bodmer on the stand to give false testimony.  I am confident that they had no idea when they put him on the stand to give that testimony that they thought his testimony was false."[21]  As discussed below, defense counsel's view of what the Government knew, or should have know, before Bodmer took the stand changed drastically following oral argument on Bourke's appeal.

## C.    Oral Argument on Appeal

At oral argument, appellate counsel, Michael Tigar, argued that the Government should have known about the discrepancy between Bodmer's testimony and the flight records and should have resolved that discrepancy before putting Bodmer on the stand.

> The  government  conceded,  or  said,  that  those  were
> mistaken dates.  I will say, Judge Pooler, that the
> government dishonorably, it seems to us, in its brief said,
> well, Mr. Bodmer made a mistake because there were flight
> records that weren't available to him that showed that.
> That he couldn't have been there.

---

[20]    *Id.* at 3184.

[21]    *Id.* at 3185.

10

> The government had this witness for seven years.  He was
> competently represented.  The records to which "he did not
> have access," . . . were records that the government
> obtained and turned over to the defense.[22]

Responding to the above argument, AUSA Harry Chernoff stated:

> The dates with respect to Mr. Bodmer, I sort of am puzzled
> by Mr. Tigar's argument that because the government had
> the flight records, Mr. Bodmer should have been
> rehabilitated in his witness prep.  It would have been utterly
> improper for us to show him the flight records to point out
> to him that his recollection of these meetings was
> apparently flawed.[23]

From the above statement, Bourke leaps to the conclusion that the

Government knew of the conflict between Bodmer's recollection and the flight

records and intentionally chose to present what the Government knew to be false

testimony.  According to Bourke, the "prosecutor's stunning admission at oral

argument" is evidence "that the [G]overnment violated Bourke's right to due

process through its presentation of Bodmer's testimony."[24]   Defendant argues that

---

[22]    Transcript of 2/11/11 Oral Argument ("App. Tr.") at 4, Ex. G to the
Haddon Decl.

[23]    *Id.* at 18-19.

[24]    Memorandum in Support of Motion of Frederic A. Bourke, Jr. for
New Trial Based on Newly Discovered Evidence ("Def. Mem.") at 1 ("The recent
oral argument in the Second Circuit revealed a startling fact, previously unknown
to the defense: The prosecution knew *before key government witness Hans Bodmer
testified* that flight records from Victor Kozeny's plane refuted Bodmer's account

"[w]hen – as here – the prosecution uses testimony that it knows or should have known is false, 'the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'"[25] For the following reasons, defendant's motion for a new trial is denied.

### D.   Bourke's Conviction Is Affirmed on Appeal

On appeal, Bourke attacked his conviction and raised issues regarding: (1) the instructions given to the jury, (2) the sufficiency of the evidence, and (3) certain evidentiary rulings made by this Court.[26]   On appeal, Bourke argued, *inter alia*, that this Court erred in admitting portions of a memorandum written by Bodmer's associate, Rolf Schmid, that appeared to corroborate key aspects of Bodmer's testimony while excluding other portions of the memorandum that contradicted Bodmer's testimony.[27]   Bourke also challenged his conviction on the false statements count on the ground that the verdict was not supported by sufficient evidence.[28]

---

of the February 6, 1998 'walk talk' with defendant Frederic A. Bourke, Jr.") (emphasis in original).

[25]   *Id.* at 15 (quoting *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991)).

[26]   *Kozeny*, 2011 WL 6184494, at *1.

[27]   *See id.* at *12.

[28]   *See id.* at *14.

Before addressing these arguments, the Second Circuit summarized

Bodmer's testimony as follows:

> Bourke and Evans returned to the Azerbaijani capital,
> Baku, with Kozeny in February 1998.  Bodmer – who
> traveled separately – testified that Bourke approached him
> in Baku and questioned him regarding the Azerbaijanis.
> Bodmer testified that during this so-called "walk-talk," he
> told Bourke of the nature of the bribery scheme and the
> corporate structures created to carry it out.  Bodmer
> conveyed the substance of his conversation with Bourke to
> Rolf Schmid, an associate at Bodmer's law firm.  Schmid
> memorialized Bodmer's description of the conversation
> years later in a memorandum[.][29]

After disposing of Bourke's four arguments regarding the jury charge,

the Second Circuit proceeded to address his argument concerning the Schmid

memorandum.  Finding no abuse of discretion in this Court's decision not to admit

the entirety of the Schmid memorandum, the court stated:

> At trial, the government was permitted to introduce a
> portion of a memorandum written for Bodmer by his
> associate, Rolf Schmid, that included an account of
> Bodmer's February 1998 conversation with Bourke about
> the corrupt scheme.  Bodmer testified that while in Baku
> with Bourke, Bodmer told Bourke about the particulars of
> the corrupt arrangements, including that the Azeri
> government officials would receive two-thirds of the
> vouchers in an arrangement that would allow the Azeri
> officials to incur no risk.  The defense called Bodmer's
> recollection of this conversation into question because
> Bodmer had trouble remembering exactly when the

---

[29]     *Id.* at *2.

13

> conversation took place.  The government then sought to
> salvage Bodmer's testimony by having Schmid testify that
> Bodmer had told Schmid of his conversation with Bourke,
> and memorialized that conversation in a memo.[30]

Finding that the Schmid memorandum was offered as a prior consistent statement

of Schmid, not Bodmer, the Second Circuit held that the rule of completeness did

not mandate the admission of the entire Schmid memorandum.[31]

The court then addressed Bourke's challenge to his false statements

conviction on the ground that the verdict was not supported by sufficient evidence.

Drawing all permissible inferences in the Government's favor, and resolving all

issues of credibility in favor of the jury verdict, the court summarized the evidence

as follows:

> Specifically, Bodmer testified that Bourke had approached
> him in February 1998 about an "arrangement" with the
> Azeri officials, and that Bodmer had then explained to
> Bourke how the Azeri officials were to receive a two-thirds
> share of the vouchers without assuming risk, and without
> payment.
>
> Bodmer's testimony regarding the timing of his
> conversation with Bourke in Baku was the subject of
> extensive cross-examination.    Documentary evidence
> demonstrated that at least one of the conversations with
> Bourke that Bodmer testified to could not have taken place
> on the date Bodmer believed it did, and the government so

---

[30]   *Id.* at *12.

[31]   *See id.* at *14.

14

stipulated.  While Bodmer's testimony regarding the date
of the conversation was questioned by the defense, that
does not mean a reasonable juror could not conclude that
the conversation took place on a different date. . . .  Bourke
argues that the only reasonable inference from Bodmer and
Farrell's failure to accurately identify the date the
conversations took place is that the conversations never
took place.  However, drawing all inferences in favor of the
government, as we must, *a reasonable juror could have
concluded that the conversations took place and that the
witnesses simply got the dates wrong*.  Thus, there is
sufficient evidence to sustain the conviction on Count
Three.[32]

Thus, the Second Circuit held open the possibility that the inconsistencies in

Bodmer's testimony were the result of a faulty recollection, not perjury.

## III.   LEGAL STANDARDS

### A.   Federal Rule of Criminal Procedure 33

Federal Rule of Criminal Procedure 33 ("Rule 33") states that "[u]pon

the defendant's motion, the court may vacate any judgment and grant a new trial if

the interest of justice so requires."[33]  "Reversal of a conviction based upon

allegations of 'perjured testimony should be granted only with great caution and in

the most extraordinary circumstances.'"[34]  A defendant seeking a new trial based

---

[32]   *Id.* (emphasis added).

[33]   Fed. R. Crim. P. 33(a).

[34]   *United States v. Zichettello*, 208 F.3d 72, 102 (2d Cir. 2000) (quoting
*United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).  *Accord United*

upon the Government's alleged use of perjured testimony must establish the following: "'(i) *the witness actually committed perjury*'; (ii) 'the alleged perjury was material'; (iii) 'the government knew or should have known of the alleged perjury at time of trial'; and (iv) '*the perjured testimony remained undisclosed during trial*.'"[35]  "When the perjury was disclosed during the trial, a new trial should not be granted."[36]  "As long as the jury is alerted to a witness' lies, the jury – the 'appropriate arbiter of the truth' – can sift falsehood from fact and make its own credibility determinations."[37]

Thus, in order to grant a new trial based on newly discovered evidence of perjured testimony, the defendant must first demonstrate that the witness, in

---

*States v. Stewart*, 433 F.3d 273, 296 (2d Cir. 2006) ("[E]ven where newly discovered evidence indicates perjury, motions for new trials 'should be granted only with great caution and in the most extraordinary circumstances.'") (quoting *Sanchez*, 969 F.2d at 1414).

[35]     *United States v. Ferguson*, 653 F.3d 61, 83 (2d Cir. 2011) (emphasis in original) (quoting *Zichettello*, 208 F.3d at 102 (internal quotation marks and citations omitted)).  *Accord United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009).

[36]     *United States v. Cromitie*, No. 09 CR 558, 2011 WL 1842219, at *25 (S.D.N.Y. May 10, 2011) (citing *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005); *United States v. McCarthy*, 2571 F.3d 387, 400 (2d Cir. 2001); *United States v. Joyner*, 201 F.3d 61, 82 (2d Cir. 2000)).

[37]     *Id.* (quoting *Zichettello*, 208 F.3d at 102).

fact, committed perjury.[38]   "A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory."[39]   "Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury."[40]   A new trial, however, is not mandated even where a witness commits perjury of a material nature.

> Whether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury.   With respect to this latter inquiry, there are two discrete standards of review that are utilized. Where the prosecution knew or should have known of the perjury, the conviction must be set aside "'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'"  *Perkins v. LeFevre*, 691 F.2d 616, 619 (2d Cir. 1982) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976));  *see also Sanders v. Sullivan*, 863 F.2d 218, 225 (2d Cir. 1988) (question is whether the jury's verdict "might" be altered);  *Annunziato v. Manson*, 566 F.2d 410, 414 (2d Cir. 1977).   Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is "virtually automatic."  *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir. 1975) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).   Where the government was unaware of a witness'

---

[38]   *See United States v. Torres*, 128 F.3d 38, 49 (2d Cir. 1997).

[39]   *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001) (citing *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)).

[40]   *Id.*

> perjury, however, a new trial is warranted only if the testimony was material and "the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Sanders*, 863 F.2d at 226[.][41]

Thus, whether to apply the reasonable likelihood standard or the heightened "but for" standard will depend on the extent of the Government's knowledge.

### B.    Newly Discovered Evidence

A motion for a new trial based upon newly discovered evidence must be filed within three (3) years after the verdict or finding of guilty; a motion for a new trial based upon any other reason must be filed within fourteen (14) days after the verdict or finding of guilty.[42]  With regard to new trial motions based upon newly discovered evidence, the Second Circuit has stated that

> "even where newly discovered evidence indicates perjury, motions for new trials 'should be granted with great caution and in the most extraordinary circumstances,'" *United States v. Stewart*, 433 F.3d 273, 296 (2d Cir. 2006) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).  To prevail on a Rule 33 motion, a defendant must show: (1) the newly discovered evidence could not with due diligence have been discovered before or during trial; (2) the evidence demonstrates that the witness in fact committed perjury; (3) the newly discovered evidence is material; and (4) the newly discovered evidence is not cumulative. *United States v. White*, 972 F.2d 16, 20–21 (2d

---

[41]    *Wallach*, 935 F.2d at 456 (parallel citations omitted, emphasis added).

[42]    *See* Fed. R. Crim. P. 33(b)(1) & (2).

Cir. 1992); *accord Stewart*, 433 F.3d at 297–300. Ultimately, "the trial court's discretion to decide whether newly discovered evidence warrants a new trial is broad because its vantage point as to the determinative factor – whether newly discovered evidence would have influenced the jury – has been informed by the trial over which it presided." *Stewart*, 433 F.3d at 296.[43]

Thus, a Rule 33 motion based on newly discovered evidence may be granted "only upon a showing that the evidence could not with due diligence have been discovered before or during trial, that the evidence is material, not cumulative, and that admission of the evidence would probably lead to an acquittal."[44]

## IV.   DISCUSSION

### A.   The Government Did Not Knowingly Permit the Introduction of False Testimony

Defendant argues that Chernoff's statement at oral argument before the Second Circuit constitutes newly discovered evidence.  But the Government's position is that Chernoff was merely responding to a hypothetical and did not make any sort of admission regarding the subornation of perjury. The Government has steadfastly represented that it was *unaware* of the discrepancy between Bodmer's testimony and the flight records until after Bodmer testified and it was alerted to the inconsistencies by defense counsel.  The Government has maintained this

---

[43]    *United States v. Gupta*, 426 Fed. App'x 12, 13 (2d Cir. 2011).

[44]    *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir. 1980).

position in its memorandum of law in opposition to the instant motion[45] and at oral

argument before this Court.[46]  At the oral argument, Chernoff represented that:

> The circumstantial evidence that we didn't know is overwhelming.  We could have lost the trial.  This was the centerpiece of the defense summation. . . . [Defense counsel] talked about how these records surfaced long after Mr. Bodmer left the witness stand.  That was wrong.  Your Honor sustained an objection to that.  Then after he assaulted our ethics, he said maybe it is a problem with the prosecutors' competence. They didn't do the due diligence.  That was all fair game.  We took our lumps for that.[47]

Assuming no actual knowledge, the next question is what the

Government "should have known" about the discrepancies in Bodmer's testimony

before he took the stand.  This is a fact-intensive inquiry.  Defendant cites *Wallach*

as a case where the Government should have known that a witness (Guariglia)

---

[45]     *See, e.g.*, Gov't Mem. at 3 ("It is therefore obvious, apart from the Government's representations, from the sequence of the events at trial, that the Government was unaware of the discrepancy.  That error was the most prominent point of the defense summation."); 6-7 ("Indeed, the defense accurately reports that the Government represented to trial counsel, once the defense sought a stipulation to the admissibility of the flight records, that the Government had been unaware of the conflict between the flight records and Bodmer's testimony with respect to the timing of his conversation with Bourke until the defense brought the flight records to the prosecutors' attention later in trial."); 13 ("[T]he Government's failure to realized the contradiction between the flight records and the Bodmer testimony before incorporating Bodmer's error into the Government's opening statemetn was perhaps the best break that the defense got in the trial[.]").

[46]     *See* November 10, 2011 Transcript of Oral Argument at 38, 47.

[47]     *Id.* at 39.

perjured himself when he testified that he stopped his compulsive gambling in the

summer of 1988.  The court found as follows:

> Defendants submit that the government was aware of the
> perjury and that the district court ignored the facts on this
> issue.  According to defendants, the prosecution should
> have been aware of the perjury once Guariglia was
> cross-examined and admitted having purchased gambling
> chips at an Atlantic City casino on two occasions in the fall
> of 1988.  Instead, the prosecution sought to rehabilitate the
> witness on redirect, permitting Guariglia to testify that he
> had bought the chips but that he had not gambled, even
> after defense counsel disclosed to the government written
> records from the Tropicana Casino reflecting that Guariglia
> had gambled.  We agree with the defendants that the
> government should have been aware of Guariglia's perjury.
>
> * * *
>
> In light of Guariglia's acknowledged history of compulsive
> gambling, we believe that given the inconsistencies in his
> statements the government should have been on notice that
> Guariglia was perjuring himself.  Yet, instead of proceeding
> with great caution, the government set out on its redirect
> examination to rehabilitate Guariglia and elicited his rather
> dubious explanation of what had happened.  Defendants
> placed before the government and the court powerful
> evidence that Guariglia was lying.   Although this
> information was not formally admitted into evidence, it
> nonetheless cast a dark shadow on the veracity of
> Guariglia's statements.  We fear that given the importance
> of Guariglia's testimony to the case, the prosecutors may
> have consciously avoided recognizing the obvious—that is,
> that Guariglia was not telling the truth.[48]

---

[48]     *Wallach*, 935 F.2d at 457.

Defendant also relies on *United States v. Freeman*,[49] but I find it to be distinguishable.  In *Freeman,* the government witness (Williams) testified that a co-defendant (Wilbourn) was present in an apartment known as the "penthouse" when, in fact, he was incarcerated during the entire period that the criminal organization used the penthouse.  Thus, the disputed perjury was clearly discernible.  The court in *Freeman* found that

> notice of Wilbourn's incarceration establishes that the government should have known that Williams's testimony was false.  Even more, once the government finally stipulated that Wilbourn was in prison the entire time the penthouse was used, that meant the government knew Williams's testimony was false.  Yet despite first using and then admitting that Williams's testimony was false, the government relied on it during closing arguments.  In sum, the district court did not err in finding that the government knowingly used false testimony.[50]

With regard to Williams' testimony, the court stated:

> To uphold the granting of a new trial, there does not need to be conclusive proof that the testimony was false or that the witness could have been prosecuted for perjury; all that matters is that the district court finds that the government has knowingly used false testimony.  Thus, we reject the government's argument that a claim under *Napue* can only be made when it can be established that the witness is

---

[49]   650 F.3d 673 (7th Cir. 2011).

[50]   *Id.* at 680.

lying.[51]

Here, the issue is not as black and white as the perjury described in *Wallach* and *Freeman*.  A brief review of the flight records in question supports the Government's position.  The flight records are difficult to read and interpret.[52]   It is conceivable that the Government did not cross-check the details of Bodmer's anticipated testimony against these difficult to decipher flight records.  Moreover, the flight records do not contradict the substance of Bodmer's testimony concerning his "walk and talk" with Bourke.  Contrary to defendant's position, the flight records do not prove that Bodmer fabricated the entire event.  Rather, the flight records merely show that Bodmer was mistaken about the date and time of the "walk and talk."[53]  Even if Bodmer invented the "walk and talk" incident, the falsity of such testimony was not as readily transparent as the perjury described in *Wallach* and *Freeman*.  Under the circumstances of this case, I find that the Government neither knew, nor should have known, of Bodmer's alleged perjury before he testified.

---

[51]     *Id.*

[52]     *See* Exs. D & E to the Haddon Decl.

[53]     *See Monteleone*, 257 F.3d at 219 ("Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury.") (citing *Sanchez*, 969 F.2d at 1414-15).

**B.      The Alleged Perjury Was Disclosed at Trial**

Bodmer's alleged perjury was disclosed during the course of Bourke's trial.  The Government introduced the flight records which indisputably established the inconsistencies in Bodmer's testimony.  Moreover, defense counsel summarized the inconsistencies repeatedly in his closing argument.  Because the jury was sufficiently alerted to the holes in Bodmer's story, a new trial is not warranted on the ground that a witness committed perjury.  Finally, I turn to the question of whether Bourke has presented any newly discovered evidence in the instant motion on the assumption that the perjury must be presented in cross-examination in order to be considered disclosed at trial.

**C.      There Is No Newly Discovered Evidence Here**

The difference between newly discovered and newly *available* evidence was addressed in *United States v. Owen*.[54]  In *Owen*, the defendant, Lance Owen, was convicted of conspiracy to distribute marijuana, along with two co-defendants, Mark Baroody and Paul Samuels.[55]  The lower court granted the defendant a new trial based on his co-defendant's post-trial statement which it considered to be newly discovered evidence.  The Second Circuit reversed, stating

---

[54]      500 F.3d 83 (2d Cir. 2007).

[55]      *See id.* at 84.

as follows:

> At Samuels' sentencing hearing, he made statements for the
> first time purportedly exculpating Owen.  Because Samuels
> exercised his right not to testify at trial, Owen claimed
> Samuels' statements were newly discovered evidence
> warranting a new trial.  The district court agreed and
> granted Owen a new trial pursuant to Federal Rule of
> Criminal Procedure 33 ("Rule 33").  We reverse.  Because
> Samuels' testimony related to his direct dealings with
> Owen, Owen was – or certainly should have been – aware
> of the substance of Samuels' testimony prior to trial, and,
> thus, it was not "newly discovered" within the meaning of
> Rule 33 when it was offered by Samuels at sentencing.[56]

In reversing the district court, the Second Circuit noted that "a decided

majority of circuits have held that, when a defendant is aware that his codefendant

could provide exculpatory testimony but is unable to obtain that testimony because

the codefendant invokes his privilege against self-incrimination prior to and during

trial, the codefendant's postconviction statement exculpating the defendant is not

'newly discovered evidence' within the meaning of Rule 33."[57]  The Second

Circuit joined these circuits and held that Rule 33 does not authorize district courts

to grant new trials on the basis of "evidence that was known by the defendant prior

to trial, but became newly available after trial" because such evidence is not newly

---

[56]     *Id.*

[57]     *Id.* at 88.

discovered, but merely newly available.[58]

Bourke's complaints about the prosecutors' alleged misconduct is not evidence, newly discovered or otherwise. Bourke had the flight records years before the trial began. In addition, Bourke knew he was not in Baku on February 5, 1998, and that he did not arrive there until 9:20 a.m. the following morning. Bourke therefore had actual knowledge of the discrepancy between Bodmer's recollection and the facts of his own travel immediately upon hearing Bodmer's testimony. Thus, Bourke was on notice of Bodmer's inconsistencies *at the time they were made*. Given his long-standing possession of the flight records, Bourke was in a position to argue that the Government knew, or should have known, of the falsity of Bodmer's testimony immediately upon hearing that testimony and certainly by the time he made his first Rule 33 motion. Needless to say, Bourke could have confronted Bodmer with his contradictory evidence but apparently made the strategic decision not to do so. Thus, neither Bodmer's alleged perjurious testimony, nor any post-trial statement made by the Government concerning that testimony, can possibly be considered "newly discovered

---

[58]   *Id.* at 89. *Accord United States v. Rigas*, No. 02 CR 1236, 2007 WL 4145282, at *1 (S.D.N.Y. Nov. 20, 2007), *aff'd*, 583 F.3d 108, 125 (2d Cir. 2009) (applying the newly discovered/newly available dichotomy in rejecting, as newly discovered evidence, testimony given by a witness during post-trial civil SEC proceedings which purportedly demonstrated that the witnesses' testimony at the criminal trial was perjurious).

evidence" for purposes of Rule 33.  Without any newly discovered evidence, Bourke's motion for a new trial  is untimely and unfounded and must therefore be denied.

## V.    CONCLUSION

For the foregoing reasons, Bourke's motion for a new trial based on newly discovered evidence is denied.  The Clerk of the Court is directed to close this motion (Docket Entry # 278).  Bourke is directed to surrender to the U.S. Marshals on January 3, 2012, to begin serving his sentence.


SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            December 15, 2011

27

**- Appearances -**

**For the Defendant:**

Harold A. Haddon, Esq.                    John D. Cline,Esq.
Saskia A. Jordan, Esq.                    K.C. Maxwell, Esq.
Haddon, Morgan, Mueller, Jordan,          Law Office of John D. Cline
 Mackey & Foreman, P.C.                   115 Sansome Street, Suite 1204
150 East Tenth Avenue                     San Francisco, CA 74104
Denver, CO 80203                          (415) 322-8319
(303) 831-7364

**Of Counsel:**

Michael E. Tigar, Esq.
552 Fearrington Post
Pittsboro, NC 27312
(202) 549-4229

**For the Government:**

Harry A. Chernoff
Iris Lan
Assistant United States Attorneys
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2481/2263